## Wytheville

## Scott's Executor v. Chesterman.

### June 10, 1915.

### Absent, Keith, P., and Kelly, J.*

1. EVIDENCE—*Custom—Contracts.*—Where the language of a contract is clear and unambiguous, evidence of a local custom or usage of trade to vary the terms of the contract will not be received. Such evidence will not be admitted under the guise of explaining language used in the contract, to engraft upon it a new provision upon which to base a substantial defense, and especially is this the rule where the usage or custom is not relied on in the pleading.

2. CUSTOM—*Pleading—Proof—Generality of Custom—Knowledge.*— Customs and usages are generally regarded as facts, and like other facts should be pleaded and proved. Furthermore, knowledge of the existence of a custom must be brought home to the parties to be affected thereby unless the evidence shows that it is so uniform and notorious at the place where parties affected by it reside as to raise a *prima facie* presumption that they knew of it.

3. INSTRUCTIONS—*Evidence to Support—Appeal and Error.*—It is error to give an instruction when there is no evidence upon which to base it except evidence improperly admitted.

4. BUILDING CONTRACTS—*Architect's Certificate of Completion— What Sufficient—Case at Bar.*—Under a building contract providing that the owner is not to be liable "except upon the final certificate of the architects in writing, signed by them, that the work had been accomplished to their satisfaction and that of the owner" when no form of writing is specified in the contract, but merely that the approval of the architects shall be "by a writing or certificate," any writing which fairly carries out the purposes for which it was intended is sufficient. In the case at bar, the certificate of the architects was first simply "O. K." and subsequently "Approved," each signed by the architects. Whether this was a sufficient compliance with

---

*Argued before Judge Kelly's term began.

the contract was rightly left to the jury under proper instructions from the court.

5. DAMAGES—*Building Contracts—Defective Performance.*—Where there are defects in the construction of a house, the measure of the owner's damages is the difference between the contract price of the house and the value of the house as actually completed.

6. BUILDING CONTRACTS—*Delays in Completion—Extension of Time.* A builder cannot claim extension of time for completing his contract by reason of delays occasioned by his failure to obtain permits and give notices which were duties imposed upon him by the terms of his contract with the owner.

7. BUILDING CONTRACTS—*Failure to Complete in Time—Damages—Rents and Profits—For What Time Computed.*—A contractor who undertakes to complete the construction of buildings by a stated time, knowing that tenants are willing and eager to occupy them, and who obtains the contract because he undertakes to complete them within a shorter period than others, but who fails to complete them within the stipulated time, should make good to the owner the loss flowing from his default. Rents and profits which would have been received but for such default are recoverable by the owner where they are shown with reasonable certainty, and are free from any element of speculation. These rents and profits do not necessarily stop when the buildings are delivered to the owner, but may extend up to the trial if they are less than the owner would have received if the buildings had been delivered to him at the time stipulated for in the contract.

8. INSTRUCTIONS—*Acceptance of Work—Waiver—Misleading Instructions.*—In an action to recover the contract price for erecting buildings, an instruction which leaves the jury to determine from the evidence whether the defendant accepted the buildings as in compliance with the terms of the contract, and whether he waived any objection he might fairly have made to any of the work, is misleading if it fails to define what acts would indicate such an acceptance, and what acts would indicate such a waiver. This is especially true where the jury has already been told in another instruction that, in order for a waiver to be effective, the defendant must have known his rights and intended to waive them.

9. APPEAL AND ERROR—*Instructions—Misleading.*—An instruction calculated to mislead the jury, whether it arises from ambiguity or any other cause, constitutes such error as will oblige the appellate court to reverse the judgment founded thereon.

74

Error to a judgment of the Circuit Court of the city of Richmond in a proceeding by motion for a judgment under section 3211 of the Code. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The defendant's instruction No. 13, mentioned in the opinion of the court, was as follows:

13. Refused.

The court tells the jury that if the jury believe from the evidence and finds under the instructions of the court, that the plaintiff was in default in not completing said stores or any one or more of them within the times fixed by the agreements between the parties, or within a reasonable and proper time thereafter, if he has shown that he was properly excused from completing said buildings by the time so limited, then the jury must find for the defendant (Scott) on his counterclaim for delay and assess his damages on that account according to the following measure of damages.

The measure of the damages which the defendant may be entitled to recover for any default of which the plaintiff may have been guilty in failing either to complete said stores, or any one or more of them, within the time fixed by the agreements between the parties, or within a reasonable and proper time thereafter, as the case may be, is all such fair and reasonable rents which it appears from the evidence he has lost from said stores or any of them up to this time and which it appears from the evidence, with reasonable certainty, he will lose, between now and March 15, 1914, by reason of any default of the plaintiff in not

completing said stores or any one or more of them as afore-said.

*A. G. Collins* and *Robert E. Scott*, for the plaintiff in error.

*Meredith & Cocke*, for the defendant in error.

Cardwell, J., delivered the opinion of the court.

This action was instituted by W. A. Chesterman, upon a notice and an amended notice under the statute—section 3211 of Code, 1904—to recover of John G. Scott, as executor of W. H. Scott, deceased, the sum of $3,851.13, with interest thereon, alleged to be due by the defendant to the plaintiff according to an account filed with said notices, under two certain contracts in writing by which the plaintiff agreed to erect and complete within stated periods of time, and in accordance with plans and specifications prepared by certain architects, four store houses, at the southwest corner of Sixth and Marshall streets, in the city of Richmond. The account filed sets forth the aggregate of the contract prices, the amount of extra work claimed to have been done, and the compensation alleged to be due therefor as well as the aggregate of the payments on the contract prices, and showing the balance due thereon to be the sum above stated.

In the original notice it was alleged: "That each and all of the houses mentioned therein have been constructed and completed in accordance with the terms and conditions of said contracts, except as modified under your instructions and have been accepted by you."

The amended notice added two common counts in assumpsit, both claiming the right to a judgment for the same amount, alleged to be due the plaintiff under the two writ-

ten contracts as stated in the account filed with the original notice, and for extra work, etc.

The two contracts are designated in the record as Nos. 1 and 2. By contract No. 1, the three stores nearest to the corner of said streets were to be completed by March 15, 1912, for the sum of $14,757; and by contract No. 2 the remaining store, No. 4, was to be completed on or before August 1, 1912, for the sum of $5,300, provided possession of the lot should be delivered to the contractor, the plaintiff, by May 1, 1912, or within 90 days from the date that the lot was actually given to him, this lot and the building thereon then being in the possession of a tenant, and upon the delivery of the possession of the lot to the contractor the building thereon was to be taken down by him to make place for the new store. Possession of lots Nos. 1, 2, 3, was given at once to the contractor, but he did not complete the stores thereon until about 7½ months after the 15th of March, 1912, the date fixed for their completion in the contract; and as to store No. 4, to have been erected and completed under contract No. 2 on or before August 1, 1912, provided possession of the lot should be delivered to the contractor by May 1, 1912, or within 90 days after possession given, it appears that possession of the premises was obtained by the owner, Scott, from his tenant and turned over to the contractor in advance of May 1, 1912, namely, on February 2, 1912; but the new store thereon was not completed until about the 1st of November following, and when completed it, as well as the other three stores, did not, it is claimed, receive the approval of the owner or the architects, though the owner took possession of all of them about November 1, 1912.

The provisions of the two contracts are practically the same, with respect to the time and manner of doing the work and the payment of the contract prices therefor, and with respect to questions involved in this litigation the

contracts provided: Chesterman, the contractor, was, for the consideration therein named, well and properly to erect said stores, furnishing all the materials and labor therefor according to the plans and specifications, and within the time agreed on, in a good workmanlike and substantial manner to the satisfaction of the party of the first part (Scott, the owner) and under the supervision and direction of the architects, Anderson, Cain & Shepherd; (b) that the owner, in consideration of the covenants and agreements of the contract being strictly performed and kept by the contractor, would pay between the first and tenth of each month, upon monthly estimates, eighty-five *per cent.* of the value of the work installed and materials delivered the preceding month; and (c) "Final payment to be made on the completion of the buildings, to the entire satisfaction of the party of the first part and of the architects; provided that in each of said cases a certificate shall be obtained and signed by the said Anderson, Cain & Shepherd."

Each contract contained these further provisions: "Should the owner at any time during the progress of the said building, request any alteration, deviation, additions or omissions from said contract, authority of same to be in writing, he shall be at liberty to do so. * * * Should any dispute arise respecting the true construction or meaning of the drawings or specifications, the same shall be decided by Anderson, Cain & Shepherd and their decision shall be final and conclusive; * * * The tenants shall be allowed to install insulation and cold storage plants during the construction of the building. The construction not to interfere with the time of completion of building."

As stated, there was an original and an amended notice in this action, the plaintiff claiming judgment against the defendant for a balance of $3,851.13 due under the two written contracts, including charges for extra work, etc.,

as shown by an account filed with the original notice. The defendant appeared and made defense to the original notice by the plea of the general issue and a special plea; and to the amended notice he filed the plea of the general issue and a special plea or answer in writing.

In substance, the defense made by the defendant was, (1) that the work done on the buildings contracted for was bad, in certain particulars; (2) that the defendant was. entitled to damages for failure to complete the houses by the times set forth in the respective contracts; (3) that the plaintiff was not entitled to sue for the balance due on the original work, because he did not have the required certificate or certificates from the architects, approved by the defendant, that the work and labor done and the materials furnished for the store-houses contracted for were done and furnished in accordance with the contracts between the parties; and (4) that said stores were built to be rented to tenants then ready and waiting to occupy them, at annual rentals (which were stated), and that by reason of the default of the plaintiff in the performance of the conditions and requirements of said contracts, the defendant had suffered damages to the amount of $8,136.61, for which he prayed judgment against the plaintiff.

No objection was interposed to these pleas, but issue was joined thereon, and upon a trial of the case the jury, after hearing the evidence and receiving the instructions of the court, returned the following verdict: "We, the jury, upon the issues joined find for the plaintiff and assess the damages at two thousand and nine hundred and nineteen dollars and fifty-seven cents ($2,919.57)." Whereupon, the defendant moved the court to set aside said verdict upon the following grounds: (1) That it was not responsive to the issues made by the pleadings, and subsequently moved in arrest of judgment; (2) that it was contrary to the law and the evidence; (3) because of misdirection of

the jury; and (4) because it was excessive. Each of these motions was overruled by the trial court and judgment entered for the plaintiff in accordance with the verdict of the jury, which judgment we are asked to review and reverse.

For convenience, the parties will be spoken of here as in the court below—plaintiff and defendant.

During the progress of the trial the defendant tendered and had made a part of the record three bills of exceptions, numbered 1, 2 and 3. No. 1 is to the rulings of the court admitting certain evidence for the plaintiff over the objection of the defendant, with reference to an alleged custom among contractors and builders in the city of Richmond, and refusing to strike out said evidence.

It is urged upon us with much force that bill of exceptions No. 1 should not be considered as a part of the record, because it does not conform to the established rule of the court with respect to like bills of exceptions.

The evident purpose of counsel for the defendant was to call in question in one bill of exceptions the rulings of the court with respect to the admissibility of certain evidence touching a particular question arising in the progress of the trial, and having a very material bearing upon the merits of the case; and while the bill of exceptions is subject to the criticism that it is unduly protracted and somewhat confused, upon a careful reading of it we do not think it is enough so to justify a refusal of its consideration. *N. & W. Ry. Co.* v. *Ampey,* 93 Va. 108, 25 S. E. 226.

The evidence referred to was given by the plaintiff himself and his three witnesses, Beazley, Ancarrow and Huntt, relating to an alleged custom with respect to underpinning the wall of a building on an adjoining lot to that which was being excavated, the question being whether the duty of underpinning or conserving the wall of the building on lot No. 4, made necessary by the excavation for the foun-

dation of the building to be erected on lot No. 3, rested upon the plaintiff or the defendant, and the nature of the evidence strenuously objected to by the defendant may be made sufficiently to appear from the following, taken from the testimony given by the witness, Beazley, who it seems was a business manager for the plaintiff:

"Q. (By counsel for plaintiff): Now the clause in the contract which I shall ask the privilege of having explained by architects and builders, so as to show what is the customary construction of it, reads as follows:

" 'The contractor shall furnish all materials, labor, transportation, scaffolding, utensils, etc., of every description required for the full performance of the work herein specified, except as otherwise particularly mentioned. He shall lay out his work and be responsible for its correctness, shall obtain all the necessary permits to properly carry out his work, paying the lawful fees therefor, shall give the proper charge, shall afford the architect or superintendent every facility for inspection, shall be responsible for all violations of law, or damage to property, caused by him or his employees, shall promptly protect his work during progress, and shall be responsible for any accidents or injuries to any persons, either workmen or the public, and shall furnish a joint policy in a reliable surety company, acceptable to the owner, covering all accidents to employees of both contractor and the owner, and the public, which may occur on the premises.'

"Will you state whether your experience will allow you to state as to what has been the actual custom and usage in the construction of that clause of the contract, what it means?

"A. I am.

"Q. State whether it includes underpinning, or such injuries to buildings and persons as may come from the handling of your materials and things of that kind?

"A. It does not.

"Q. Is the underpinning of an adjoining wall a part of your contract unless it is so specified, or is it additional work?

"A. In my experience it has always been additional."

The testimony given by the plaintiff and his witnesses, Ancarrow and Huntt, on this point was the same as that of Beazley, and the purpose and effect of the alleged custom or usage testified to was not only to relieve the plaintiff from the obligation to underpin or otherwise take care of the wall of the old building on lot No. 4, but to justify his claim for an allowance of additional time for the completion of the buildings. None of these witnesses undertook to define the nature and extent of the custom or usage they had reference to, or state what it was, so that the jury could determine whether or not the custom in fact existed, and the court could rule as to its effect upon the contract. It had been shown in evidence that the completion of the stores on lots Nos. 1, 2 and 3 was delayed in part by the necessity of leaving a bank of earth on No. 3 to protect the adjoining wall of the old house on lot No. 4, the plaintiff refusing to shore up or underpin that wall, claiming that it should have been done by the owner, the defendant, and that as soon as this question was raised, the plaintiff presented it to the architects by letter of December 2, 1911, saying in his letter that the work on the excavation for these stores had reached the point where it was necessary to determine who should have this wall underpinned, and proposing to do it at cost plus 15%, making claim also for additional time in the completion of said buildings covering the time taken in determining the question and in doing this work. The defendant, the owner, at once denied his liability for this work, and on December 5, 1911, the architects decided the question against the plaintiff, calling his attention to the fact that this was one

75

of the things considered at the time of the letting of the contracts, denied his request for the additional time, and advised that he proceed with the work; the letter so far as pertinent here being as follows:

"We think that the matter of conserving the wall mentioned was made clear to you at the time of signing contract, or rather your representative, Mr. Beazley, as the statement which Mr. Scott has repeated in his letter was made to Mr. Beazley in our office on the day mentioned and will be confirmed by our Mr. R. A. Munden, of Petersburg, who was present at the time and heard the conversation.   We think that this is amply covered also in the specifications under the 'General Conditions,' which state that contractor shall be responsible for any damage to adjoining property, etc.   You were, of course, aware of the fact that Mr. Scott could not obtain from his tenant, now occupying this building, the lease which he desired to do and that this building would have to stand until April 30, or time of the expiration of the lease, which the tenant of this building holds, and that this wall would have to be conserved in some manner.   It is immaterial to us how it is done, so it is satisfactory to the building inspector, and so the wall stands until the time the lease expires.   We think it is very clear that this comes under your contract, and see no reason for any further delay in the matter, and would advise you to proceed at once with the work."

It was also shown that neither the architects nor the defendant had ever heard of the alleged custom sought to be proved by the witness, Beazley, and others.   The testimony of the witness, Beazley, and others had reference to the true construction or meaning of one of the clauses of the general conditions of the specifications which has just been quoted, and with respect to this the contract provided: "Should any dispute arise respecting the true construction or meaning of the drawings or specifications, the

same shall be decided by Anderson, Cain & Shepherd, and their decision shall be final and conclusive."

As observed, the question as to whose duty it was to underpin or otherwise conserve the wall of the building on lot No. 4 while the excavation of the foundation for the store on No. 3 was being done, was referred to the architects and they promptly and clearly decided that it was the duty of the plaintiff, the contractor, and that he was not entitled to additional time for the fulfilment of his contract by reason of delay covering the time taken in determining this question and in doing the work. Of this alleged custom, varying the meaning of the contract as construed by the architects, no intimation of any reliance upon it was given in the pleadings, in the plaintiff's statement of the particulars of his claim, or in the statement of the grounds of his defense to the defendant's special plea, a statement which the court required to be filed. There was no effort made by the plaintiff to bring home knowledge of this alleged custom to the defendant or to the architects, although they testified that they had never heard of such a custom; nor was there any evidence to prove that the custom was so general, uniform and notorious as to raise a *prima facie* presumption of knowledge thereof on the part of the parties to be affected thereby. There was also no proof offered as to fraud, or its equivalent, on the part of the architects in deciding the question submitted to them by the letter of December 2, 1911, *supra,* against the contractor. In these circumstances it was error to admit testimony of the plaintiff and his witnesses, Beazley and others, above mentioned, with respect to the alleged custom.

Evidence in such a case will not be admitted under the guise of explaining language used in the contract, to engraft upon it a new provision upon which to base a substantial defense and especially is this the rule when the usage or custom is not relied on in the pleadings. *Syer &*

*Co.* v. *Lester*, 116 Va. 541, 82 S. E. 122, and authorities cited.

Among the authorities there cited is *Oriental L. Co.* v. *Blades L. Co.*, 103 Va. 740, 50 S. E. 270, where in the opinion of the court by Buchanan, J., it is said: "There is some conflict in the authorities as to the necessity of pleading a custom or usage of trade * * * But whenever that question has been raised in this court, except in the case of *Hansbrough* v. *Neal & Co.*, 94 Va. 722, 27 S. E. 593, which was thought to be an exception to the general rule, it has been considered necessary for the party relying on such custom or usage to set it up in his pleadings. *Jackson's Admr.* v. *Henderson*, 5 Leigh, p. 196; *Governor, &c.,* v. *Withers*, 5 Gratt. 24, 50 Am. Dec. 95. And this view would seem to be the better one, since such customs or usages are generally regarded as facts, and like other material facts should be averred and proved."

In the still later case of *Bowles* v. *Rice*, 107 Va. 55, 57 S. E. 575, this court said: "Furthermore, knowledge of the existence of the custom must be brought home to the plaintiffs (the parties affected thereby) unless the evidence shows that it is so uniform and notorious at the place where the parties affected by it reside as to raise a *prima facie* presumption that they knew of it."

In *Ferguson* v. *Gooch*, 94 Va. 9, 26 S. E. 397, 40 L. R. A. 234, the opinion quotes approvingly authority for the proposition that a custom of trade may control the mode of performance of a contract, but cannot change its intrinsic character.

In the case here, the contract is neither silent nor ambiguous on the point to which the above mentioned evidence of the plaintiff was directed, but when applied to the subject matter and the conditions known to both parties, the contract is clear and unambiguous in the judgment of the architects, as shown by their letter of December 5, 1911,

quoted from above, and which had reference to the "General Conditions" clause of the contract which provided that the contractor "shall be responsible for all violations of law, or damage to property, caused by him or his employees, shall promptly protect his work, and shall be responsible for any accidents or injuries to any persons, either workmen or the public * * * "

The case of *Richmond City* v. *Barry,* 109 Va. 274, 63 S. E. 1074, greatly relied on by the learned counsel for the plaintiff as authority for the admission of said evidence, was wholly different from this.    In that case the question arose upon a demurrer to the evidence—that is, as. to how the bricks laid in a sewer should be counted, whether by actual count or by measurement, under the following ambiguous clause in the contract: "Price for brick furnished and laid in sewer twenty dollars and fifty cents ($20.50) p. m." In the opinion of the learned judge of the trial court made a part of the record in that case and adopted as a part of the opinion of this court, it is said: " 'Extrinsic evidence.' it is said in Browne on Parol Evidence, sec. 57, 'is admissible in the construction of a mercantile contract, to show that phrases or terms used in the contract have acquired, by the custom of the locality, or by usage of trade, a peculiar signification not attaching to them in their ordinary use; and this whether the phrases or terms are in themselves apparently ambiguous or not.' And again it is stated in the same work (p. 216) 'that parol evidence is competent to annex to a contract a custom or usage of the business and locality known to the parties, or so generally and well settled as to be presumed to be known to them, and with reference to which they must be deemed to have contracted.' As the contract in this case contains no stipulation as to the method by which the quantity of brick was to be ascertained for settlement, but is silent, or at least ambiguous, in that respect, parol evidence was admissible

to show whether there was any agreement between the parties as to this matter, and if so, what it was; and if there was no agreement between them, then to show what was the custom of the locality where the contract was made, or the usage of trade, and with reference to which, in the absence of any special agreement they are to be deemed to have contracted. * * * and we have it conclusively established that according to the usages of trade and the universal custom, the price of bricks laid in the sewer at $20.50 per 'M' means, and meant at the time of the making of the contract, that the bricks, both for the horizontal sewer as well as for the manholes, were to be paid for by measure and not by count."

The trial court in this case having erred in admitting the evidence just discussed, it follows that it also erred in overruling the defendant's motion to strike out said evidence.

We are also of opinion that the court erred in this connection in giving plaintiff's instruction No. 7, telling the jury that if they believed that the plaintiff was delayed in the execution of the work by the failure of the defendant to have his store No. 322 (on lot No. 4) underpinned, and that it was not the duty of the plaintiff under the contract to do such underpinning, but was incumbent upon the defendant, then the plaintiff was entitled to such an extension of time for the completion of stores Nos. 1, 2 and 3, beyond the date fixed in the contracts as would equal the length of such delay. Without the evidence of Beazley and others as to said custom and usage, improperly admitted, there was no evidence in the case justifying the giving of instruction No. 7.

It appears that during the progress of the work an incorporated company known as Shepherd & Peale, Incorporated, succeeded to the business of Anderson, Cain & Shepherd, architects named in said contracts, Cain and Ander-

son retiring, and Peale acting for said corporation became the inspector of the plaintiff's work being done for the defendant on or about the 11th day of September, 1912, after the concrete work had been fully completed; hence he knew nothing about how it had been done. It further appears that the plaintiff made up a final statement of his account as of October 21, 1912, showing a balance of $3,-842.05, and presented it to Peale, and he marked it, "Approved Nov. 4, 1912, Shepherd & Peale, Inc., per Harry Peale." Upon this statement a certificate for $2,000.00 was afterwards signed by Shepherd, and was paid by defendant to the plaintiff through Shepherd, but no other or final certificate covering the balance or final payment due the plaintiff has ever been issued as provided for in the contracts, the contracts stipulating that the owner should not be liable except upon the final certificate of the architects in writing, signed by them, that the work had been accomplished to their satisfaction and that of the owner.

Peale, testifying for the defendant in this case, said: "The concrete work on these stores was entirely unsatisfactory to me when I took charge, at which time all the concrete work was finished." He also stated that the concrete work was never approved, and that the endorsement on the account referred to was intended merely as showing a correct statement of the payments theretofore made, saying: "This concrete was never approved by 'Shepherd & Peale, Inc., per Harry Peale.' This paper alluded to was approved, as stated by me, on November 4 as being a correct amount of the contract, of the money paid and of the balance due. The approval of a bill by an architect in no way can be construed as an approval of the work. All approvals by architects during the progress of the work are distinctly stated in the code of the American Institute of Architects as not approving defective work; and the only approval of the work is the last and final certificate given

by the architect." The witness further stated that no esti-
mate was given by him to Chesterman, the contractor, but
the bills submitted by Chesterman to Shepherd & Peale as
architects for approval were gone over with him, and find-
ing the amounts correct were approved as to amounts.
Cain, one of the architects named in the contracts, who pre-
pared the specifications and was the inspector of the work
during the time the concrete work was being done, testified.
in reference to it, that the work had not been done to his
satisfaction; that he had not at any time accepted the con-
crete work as having been done according to the plans and
specifications; that he had examined this work since he
left there, in company with several other parties, and con-
sidered it bad.   Shepherd, another of the architects named
in the contracts, who remained in charge of the work
throughout, testified that it was his business to issue cer-
tificates upon which payments to contractors were made,
upon the report of his associate, Cain, as to the manner in
which the work was done; that when Cain retired Peale
performed the duty of supervising the buildings, but was
never vested with authority to issue certificates, all cer-
tificates upon which payments were made being issued and
approved by him, except one, which went through during
his absence, and that he did not issue the final certificate
(in this case) because he was not satisfied with the man-
ner in which the work had been done.   Witness further
stated that while Peale took the place of Cain to pass upon
the work, he was given no authority to issue certificates;
that in this particular case he at no time considered Peale's
report or statements as to work done conclusive, and that
he, witness, did not issue a final certificate, as called for
by the contract, because he was not satisfied that the work
was completed satisfactorily to the owner, and that he, him-
self, was not satisfied with its completion.   The owner, the
defendant, testified that the work was not done to his satis-

faction, that it was done of defective materials and upon having it examined by competent experts he was advised that it was materially and substantially defective, the damages to his buildings, their impaired value on account thereof being not less than $300.00. The experts and real estate agents called as witnesses for the defendant corroborated him in his statements as to defective materials used in the work, etc.

On the other hand, the plaintiff introduced witnesses and a number of letters to prove the following facts: (1) That there was never any complaint theretofore made for defective concrete work, for which two or three thousand dollars damages were claimed upon the trial of the case; (2) that the only complaint which was ever made about the concrete was the roughness of the walls, which was removed; (3) that the houses were received by the defendant without any objection; (4) that the concrete, instead of being soft, was firm and strong—capable of carrying the required load; and (5) that the cracks in the concrete work were such as could be easily repaired at a very small outlay, and that the defendant never intimated an intention to claim damages because of defective work until November 13, 1912, which was after the stores had been taken possession of by him.

Under the defendant's second assignment of error it is insisted that the court's rulings in giving and refusing instructions on this branch of the case were erroneous, and in fact it is urged that the plaintiff did not have a right to bring this suit, as the work was not done to the satisfaction of the defendant and the architects as required by the contracts, nor had the plaintiff obtained from the architects the certificate required by the contracts.

It is true that the contracts provided that the work was to be done, "within the time aforesaid in a good, workmanlike and substantial manner, to the satisfaction of the party

of the first part and under the direction of said Anderson, Cain & Shepherd to be testified to by a writing or certificate under the hand of said Anderson, Cain & Shepherd. * * * Final payment to be made on completion of the buildings to entire satisfaction of party of first part and the architects; provided, that in each of said cases a certificate shall be obtained and signed by the said Anderson, Cain & Shepherd." But it appears from the facts proved or admitted, that after the buildings contracted for had been completed, they were, on or about November 1, 1912, turned over to the defendant and were received by him without one word of objection or complaint; that he never made any complaint about the work until at the meeting between him, Peale, Beazley and Chesterman, on November 13, 1912, at which meeting his complaint was confined to an objection to the rough appearance of the concrete basement walls, which was afterwards remedied, and at which meeting Peale suggested that $350.00 would be fair compensation for the defects in the concrete work complained of, and advised a settlement on that basis of the balance claimed by plaintiff on the account he had presented, and which Peale had endorsed and stamped "Approved." Neither defendant nor the architects ever made any objection to the concrete work until this suit was brought, and at the trial the defendant, as it would seem, made no claim for damages because of the roughness of the walls, but confined his testimony and complaint to the concrete floors. Not only so, but on October 5, 1912, plaintiff wrote the architects as follows: "I am enclosing you herewith my bill for balance due on the contract work in connection with the above mentioned store buildings. Everything in connection with said contract has been completed, except the straightening up of the concrete walls.

"I would call your attention to the fact that we have not collected anything for extra work whatever, and which will total three thousand ($3,000.00) dollars, or more.

"Trusting that I may receive voucher for the same at an early date," etc.

To this letter the architects replied on October 8, acknowledging the receipt of the plaintiff's bill for balance due on contract work "in connection with the above mentioned store buildings," saying: "We have seen Dr. Scott and if you will call in here tomorrow morning we will have the check on account for you. Kindly make us up a statement showing your contract price, and the various amounts itemized that have been paid on same up to date, also let us have your bill for extra work and allowances." On October 10 a partial payment of $3,000 was made on the account, and October 11 the architects wrote: "On the writer's visit to the building this morning we find that you have no workmen there at all. This is absolutely necessary that the small items that are yet to be completed should be done at once, so as to complete your contract on the above buildings."

Several meetings were then had between Peale and Beazley, representing the plaintiff, about the amount claimed, and Peale asked that a separate bill be made out for the extras, which was done. By October 21, the two bills were made out—one for the original contract work, and the other for the extras. When the bill for the original or contract work was first made out, the balance due thereon was $3,-842.05. Subsequently, on November 13, after a conference had earlier in the month between the plaintiff, the contractor, and his agent Beazley, and Scott, the defendant, and Peale, another payment of $2,000 was made, leaving due on that bill $1,842.05; Scott, the defendant, having taken possession of the buildings thirteen days prior. That bill was presented by the plaintiff upon the trial as a cer-

tificate of the architects required by the contract. The bill, as before stated, had upon it the following: "Approved November 4th, 1912, Shepherd & Peale, Inc., per Harry Peale"; also on it appeared these letters, "O. K., H. P." It is not disputed that Peale put said endorsements on the bill and therefore the only question presented with respect thereto was, what effect was to be given to such approval, and whether the defendant knew of it. Beazley and the plaintiff contended that the defendant knew of such approval, while the latter denied knowledge thereof and proved that he was not in Richmond on that day. On the other hand, Peale, testifying for the defendant, asserted positively that the defendant was present when the paper was approved, although he (witness) denied that it was intended as a certificate. It appears, however, that the defendant himself, when testifying, made these statements: "There were one or two conferences about extras prior to that" (Nov. 13th). "Our interviews were very largely confined to the extras." "As to the amount of the payment on the contract, there was never any dispute as to the amount."

Peale again speaking of this paper marked, "Approved Nov. 4th," testified: "Dr. Scott and Mr. Chesterman and myself had a consultation a week, or perhaps two weeks, prior to this date on this bill." It would seem from this statement that Peale at the conference he referred to and when the defendant was present, then marked on the bill "O. K., H. P." and stamped it afterwards on November 4, for he explains the circumstances as follows:

"A. This is a pencil O. K. in my handwriting. 'O. K.'d' for my own convenience before running the final approval stamp on it.

"Q. Did you mean when you first examined it you marked it O. K. and that was previous to your stamping it? A. Yes.

"Q. An O. K. does not mean that the bill is correct and due?    A. No; the pencil O. K. is only a memorandum of my own, that the bill was to be approved, which it was later."

This evidence certainly strongly tended to prove that the bill was actually approved and O. K.'d before November 4 at a meeting at which the defendant was present, although it was not regularly stamped until the subsequent date of November 4, so that whether defendant was in Richmond on the last named date would be immaterial, for if the bill was endorsed approved by the architects in his presence, the stamping of a more formal approval thereon afterwards made it no less an approval, if the first endorsement was intended and understood between the parties to be such approval as the contracts required, which was a question of fact for the jury to determine from the evidence, since the contracts did not specify the form of the writing, but only said, "by a writing or certificate;" a printed form, according to the evidence, being used in such cases only as a matter of convenience.   One of the witnesses, Wright, a civil engineer, testifying on this point said: "My understanding is that the certificate is given as written evidence of the approval of the work and of the amount; I don't know that it makes any difference what form it is on, just so it is written and signed as evidence of approval on the part of the architect.   That is my understanding of it."   To the same effect is the testimony given by witness, Huntt, an experienced architect, and there was no evidence to the contrary; the defendant to avoid the effect of the paper in question relying alone upon the evidence of the architect, Peale, that he did not intend that paper to be final estimate, but only a paper showing "a correct amount of the contract, of the money paid and of the balance due."

We agree with the learned counsel for the plaintiff that it is quite difficult to understand the distinction which the witness, Peale, attempted in saying that he did not mean a paper as a certificate of approval which he first marked "O. K." and then stamped "Approved"; especially is it difficult to understand his attempted distinction when he afterwards admitted that it was broader than he claimed at first, saying: "As answered before, it was approval of workmanship, materials and amounts, but was not the final approval."

The plaintiff, at the trial, also produced a similar paper to that of the first dated October 21st, as his bill for extras, and it is conceded that that paper was examined by the defendant and Peale at the meeting on November 13, all items being then approved except two—one of $61.60 and the other of $63.36, opposite to which items was written the word "arbitrate," as they were to be the subject of arbitration. After that had been done the defendant asserted for the first time his right to a set-off against the plaintiff's claim for delay. This bill was not then approved in writing, as there were the two items to be settled by arbitration, and on December 11, following, plaintiff saw Peale, who had removed to New York, and asked whether or not he would approve the bill for extras with the exception of the said two items; whereupon Peale wrote upon the bill: "The above bill is correct except the following two items, which it was agreed to arbitrate: item of $61.60 for cement mortar in laying old bricks, item of $63.36 for extra thickness in concrete floor in store No. 4. Approved by Harry Peale, December 11, 1912, New York City." Shepherd was then seen, and having been shown the approval of Peale, he approved it to the extent to which Peale had approved it by writing thereon, "Approved January 11, 1913, Shepherd & Peale, Inc., per A. T. Shepherd." Subsequently he wrote upon the bill as follows: "This

item of $63.60 has been investigated and the thickness of the floor found to be 7" (inches) at a point immediately in front of refrigerators. A. T. Shepherd. January 22, 1913." The plaintiff then abandoned his claim as to the item of $61.60 and brought this suit. The defendant at the trial denied also that said bill for extras was a proper certificate, although he did not deny that on November 13, 1912, all of the items thereon were in his presence checked as correct except the two items mentioned for arbitration.

The defendant had the possession of the four stores from and after November 1, 1912, made a payment to the plaintiff of $2,000 November 13 on account of the balance due on the statement and account O. K.'d and stamped approved by Peale, and, though he refused to pay the balance due, it nowhere appears that it was because the plaintiff had not furnished him a more formal writing or certificate of a final estimate signed by the architects. Upon the foregoing state of facts and circumstances, which if not admitted the evidence tended strongly to prove, the defendant, in asking instructions to the jury, recognized that the plaintiff had the right to sue for the amount claimed in his bill for extras endorsed, "Approved January 11, 1913. Shepherd & Peale, Inc., per A. T. Shepherd," but only claimed that the first paper "O. K.'d" and stamped "Approved November 4, 1912, Shepherd & Peale, Inc., per Harry Peale," was not a sufficient compliance with the requirements of the contract.

There is, therefore, no dispute that Peale put on the first named paper the words and letters appearing thereon and the authorities seem to hold with uniformity that when no form of writing is specified in the contract, but merely that the approval of the architects shall be "by a writing or certificate," any writing which fairly carries out the purposes for which it was intended is sufficient.

In *Mercantile, &c. Co.* v. *Hensey,* 205 U. S. 298, 27 Sup. Ct. 535, 51 L. Ed. 811, 10 Ann. Cas. 572, language very similar to the contracts in this case was used, the language there being: "Provided, that in each of the said cases a certificate shall be obtained from and signed by the architect." The paper relied on as a compliance with that provision of the contract was a letter, and the Suppreme Court of the United States held that to be sufficient. See also *Wyckoff* v. *Myers,* 44 N. Y. 143; *Eastham* v. *West &c. Co.,* 36 Wash. 7, 77 Pac. 1051.

As to the paper relied on in this case, the court by its instructions fairly submitted to the jury two facts to determine from the evidence—1st: Whether the defendant saw the paper and agreed that the work was satisfactory to him, as testified to by the witness, Beazley; and 2nd: Whether Peale intended said paper to be the certificate called for by the contracts; both of which questions were decided by the jury in favor of the plaintiff.

In view of the facts and circumstances narrated, it would be, as it seems to us, a manifestly unjust and unwarranted ruling that the plaintiff could not maintain this action to recover the balance alleged to be due him by the defendant for the work done and materials furnished under their contracts. But whether the defendant was entitled to a recovery on his special plea of set-off, claiming damages of the plaintiff by reason of defective concrete work and for loss of rentals from the four stores because of delay in their completion according to the terms of the contracts, and if so, how much, was also a question for the jury under proper instructions from the court.

It is too well settled to require citation of authority that the rule as to the measure of damages for the defective work in such a case is the difference between the value of the houses built according to the contract—the contract price—and the value of the houses as actually completed.

There is little or no controversy here with respect to the court's instructions on that feature of the case, and we pass to the consideration of the question as to who was responsible for the delay in the completion of the buildings, and the instructions given and refused by the trial court submitting that question to the jury.

The claim for the allowance of additional time because of delay was based on three grounds: (1) Because of the refusal of the defendant to be responsible for the under-pinning of the wall of the house on lot No. 4; (2) Because of the act of City Inspector Beck in stopping the work between the 20th of February, 1912, and April 4, 1912; and (3) Because of delay necessarily involved in the performance of the extra work ordered from time to time.

We are unable to find in the evidence anything to justify the third ground for delay, and have already sufficiently discussed and disposed of the first ground, relating to the underpinning of the wall of building on lot 4.

With respect to the question whether or not the plaintiff should be allowed additional time by reason of the work being stopped by the building inspector from February 21 to April 3, 1912, it is to be observed that the work was wholly in charge of the plaintiff, as an independent contractor, responsible for the result, and if the completion of the buildings contracted for was delayed the burden was upon him to show that the fault was not with him, but with the defendant. By the "General Conditions" clause of the specifications it was expressly set forth that "all requisites shall be supplied for the proper construction and completion of the work, according to the true intent and meaning of the plans and specifications without any cost whatever to the owner. * * * The contractor shall observe all city ordinances and regulations of building inspection, which will form a part of these specifications." The city ordinances provided that no building should be erected without

77

a written permit to the owner, issued by the building inspector upon plans and specifications to be approved by him, and the first clause of the "General Conditions" of the plans and specifications, made as we have seen a part of the contract, distinctly provided that the permit to erect the buildings should be secured by the contractor; the language of the contract being "He shall lay out his work and be responsible for its correctness, shall obtain all necessary permits to properly carry out this work, paying the lawful fees therefor, shall give the proper authorities all requisite notices relating to the work in his charge." Accordingly, the plaintiff, on November 25, 1911, made an application for the necessary permit required by the city ordinances, basing the application upon the plans and specifications for the buildings as originally drawn, which called for an excavation for the cellar and foundation under stores 1, 2 and 3 of a depth of 12 feet, but before this application was made, and the day after the execution of the contract, that is, on November 11, upon the suggestion of the plaintiff himself to carry the depth of the excavation two feet deeper, these plans had been modified by an agreement between the parties to the effect that the excavation should be carried to a depth of 14 feet. This increased depth of excavation having been agreed on, the plaintiff's compensation was increased accordingly and for this increased consideration he undertook to carry out his contract as thus modified. But, in applying for the necessary building permit, he failed to note this increased depth of the excavation called for on the plans, that is, he failed to give the building inspector any notification thereof, the consequence of which was that the permit was issued on the original plans. Subsequently, to-wit, on February 21, 1912, the building inspector, upon finding that the excavation was being carried two feet deeper than called for in the plans and specifications approved by him, ordered the work

stopped, and no further progress was made on the work till April 4, following.   These appear as undisputed facts, and at the trial of this case there was also evidence introduced tending to prove that had the plaintiff filed with the plans and specifications submitted to the building inspector, the letter of November 11, 1911, by which the defendant directed the increased depth of the excavation and agreed to allow additional compensation therefor, or notified the inspector of this change, there would have been no difficulty in going forward with the work according to the terms of the contracts.

It is insisted by the learned counsel for the defendant that the trial court erred greatly to his prejudice in its rulings with respect to instructions given and refused upon this branch of the case, in that, by the court's rulings the responsibility for the action of the building inspector, stopping the work on February 21, 1912, was put wholly upon the defendant and thereby justified the claim made by the plaintiff that he should be excused for the delay from that date to April 4, following, in completing the work on stores 1, 2 and 3, as well as in completing the work on store No. 4, instead of leaving to the jury the determination of whether or not this stoppage of the work was due to the plaintiff or to the defendant, as was asked in instruction No. 23, offered by the defendant and refused.

Instruction No. 6 given for the plaintiff, having told the jury that the plaintiff was entitled to such an extension of time beyond the dates fixed in the two contracts for the completion of the houses respectively as the jury might believe from the evidence he was delayed, by the orders of the building inspector between February 21 and April 4, 1912, and also to such an additional extension of time as the jury might deem reasonable for any delay which they believed from the evidence the plaintiff was caused to suffer by reason of the orders of the building

inspector, it was clearly erroneous to refuse instruction No. 23, asked by the defendant, to the effect that if the stoppage of the work by the building inspector was due to the failure of the plaintiff to apply for the proper permit or to give the inspector the proper notices, he could not be excused for the delay thereby occasioned, and that the defendant "is not responsible for, and cannot be charged with, any delay in the completion of said buildings, or any of them, caused by such stoppage, or which could reasonably have been prevented had the plaintiff applied in due time for proper permits, or had in due time given the proper authorities 'all requisite notices relating to the work in his charge.'" The defendant sought to have the jury told that he should not be charged for any delay which could reasonably have been prevented had the plaintiff complied with the express terms of his contracts, and the jury should have been so instructed, especially in view of the fact that the stoppage of the work of excavating for stores 1, 2 and 3 could not have affected in any manner the progress of building No. 4, and that the evidence tended to prove that the real cause of the delay was the neglect of the plaintiff to push forward his work, coupled with the bad weather and other obstacles he encountered, and of which, under the well settled rule in such cases, he took the risk.

The next question for consideration is whether or not the court erred in its rulings as to the measure of damages, if any, that the defendant was entitled to as a set-off against plaintiff's demand.

In addition to the facts stated, it appears from the evidence that at the time these contracts were let, tenants were ready, willing and eager to occupy the buildings as soon as completed, and that this was known to the plaintiff; that the contracts were made expressly with reference thereto and given to the plaintiff because he undertook to

complete them sooner than any of the other bidders therefor. The evidence also tended to prove that the defendant lost the reasonable rentals that he would have received had the buildings been completed on time—that is, the three stores 1, 2 and 3 by March 15, and store No. 4 by May 2, 1912; that on stores 1, 2 and 3 up to the institution of this suit and that on store No. 4 up to the trial of the case.

With his plea of set-offs the defendant filed a statement showing the losses of rentals from the several buildings and the evidence tended to affirmatively show that such was the fair and reasonable rental values of the stores—in fact, no question seems to have been made as to the reasonableness of the figures given in said statement. Therefore, the contention of the defendant was only for the actual definitely ascertained loss he had sustained of rentals from tenants then ready and willing to take possession of the several stores at the times the plaintiff had contracted to have them completed and ready for occupancy by tenants.

Every consideration of right and justice demands that a party to a contract based on a full and fair consideration which he receives should make good the loss to the other party flowing from his default; and rents and profits which would have been received but for such default, are recognized by the authorities as recoverable where they are shown with reasonable certainty and are free from any element of speculation. *Burruss* v. *Hines*, 94 Va. 413, 26 S. E. 875; *Perry Tie, &c. Co.* v. *Reynolds*, 100 Va. 264, 40 S. E. 919; *Raven Red Ash Coal Co.* v. *Herron*, 114 Va. 103, 75 S. E. 752.

On this point the defendant asked for instruction No. 13, which propounded correctly the rule of law laid down in the cases just cited, but the court so modified the instruction as to limit the recovery of the defendant on his plea of set-offs for lost rents to the time the houses were turned

over to him, thus precluding from the consideration of the jury the loss resulting after that time, a loss which, on one store, continued up to the time of the trial.    This instruction was refused, notwithstanding the court had given plaintiff's instruction No. 14, telling the jury that it was the duty of the defendant to take possession of the houses and to suffer his tenants to enter as soon as practicable, whether completed or not, and to make the best he could of the situation, thereby diminishing as far as possible his injury by reason of plaintiff's default in the fulfilment of his contracts.

It follows that we are of opinion that defendant's instruction No.13 should have been given as asked.

The remaining question requiring consideration is whether or not the court erred in giving plaintiff's instruction No. 1, on the question of an alleged waiver by the defendant of his right to claim damages for defective work in the buildings.    This instruction left to the jury to determine from the evidence whether the defendant accepted the buildings as in compliance with the requirements of the contract; but while the instruction also told the jury that they "Might consider when, to what extent and in what manner the defendant expressed, if at all, his dissatisfaction with the work, and whether by any acts or by conduct on his part during the construction of the buildings, or after their alleged substantial completion and the surrender of the houses to the defendant, he waived any objection he might have fairly made to any of the work," it not only failed to define, as it should have done, what acts would indicate such an acceptance and what acts would indicate such a waiver, and therefore the instruction was plainly misleading, especially so when read in connection or along with instruction No. 14, given for the defendant, which rightly limited the alleged waiver to an intention to waive, knowing at the time that he was waiving his rights, and

that it should plainly appear that he did know his rights and intended to waive them.

It has been too often ruled by this court to need citation of authority, that any instruction calculated to mislead the jury, whether it arises from ambiguity or any other cause, ought to be avoided; and if given it will oblige the appellate court to reverse the judgment.

We have not undertaken in this opinion to consider all of the numerous questions arising on the assignments of error and elaborately argued by counsel, for the reason that such of the questions as we have not directly discussed and ruled on are not, as it would seem to us, likely to arise upon another trial of the case.

For the reasons stated, the judgment of the circuit court must be reversed, the verdict of the jury set aside, and the cause remanded for a new trial to be had not in conflict with the views expressed in this opinion.

*Reversed.*