# Richmond

## W. F. FLANAGAN, ET ALS. V. N. B. HARVEY.

March 16, 1933.

Present, Campbell, C. J., and Holt, Epes, Gregory and Browning, JJ.

The opinion states the case.

*Gilmer, Wysor & Gilmer, Dalton & Jordan* and *W. B. Kegley*, for the plaintiffs in error.

*John S. Draper, John W. B. Deeds* and *W. J. Henson*, for the defendant in error.

BROWNING, J., delivered the opinion of the court.

This case comes to us on a writ of error to the judgment of the Circuit Court of Pulaski county.

The parties will sometimes be referred to in their individual names and sometimes as they were related in the trial court. The case was tried twice. The first trial resulted in the disagreement of the jury. Upon the second trial a special jury was asked for and had, and a verdict was returned for the plaintiff for the full amount sued for, being $4,976.95, with interest. Motions were made to strike out the testimony of the plaintiff at the conclusion of the plaintiff's testimony and also at the conclusion of all of the testimony, and to set aside the verdict as contrary to the law and the evidence and for the admission of improper and illegal evidence and misdirection of the jury. The court overruled the motions referred to and entered judgment upon the verdict.

The facts considered pertinent to be here stated are as follows: In 1923, a partnership for the purpose of dealing in cattle was formed by Henry Flanagan, J. W. Flanagan, W. F. Flanagan, all brothers, and F. H. Flanagan, a nephew of the two former and son of the latter partner. This firm or partnership operated for partnership purposes and sometimes the individuals composing said partnership operated individually, the territorial scope of such operations included the counties in Southwest Virginia beginning with Montgomery county and extending through the intervening counties to the Tennessee line, one of the individuals embraced within his dealings a part of east Tennessee and upon one occasion a considerable number of

cattle were shipped into the home territory from the State of Texas. The partnership formed in 1923 was styled Flanagan Brothers Company, which dealt in cattle through the years 1923, 1925, 1926, 1927, 1928 and 1929, inclusive. The year 1924 is not mentioned as a period in which this partnership engaged in its business for the reason that it is claimed by the Flanagans that another distinct firm composed of the three brothers and styled Flanagan Brothers bought and sold feeder cattle in that year. This latter firm sold to N. B. Harvey, the plaintiff in the trial court, certain cattle that year upon what has been called throughout this case a "buy back" plan—*i. e.*, the customer purchased from the dealer feeder cattle for delivery in the fall and at the same time the dealer agreed to buy them back for delivery in the following fall, the customer having fed them through the winter season and grazed them through the summer to the point at which they are called fat, beef or market cattle. The customer bought at a fixed price per pound and sold back to the dealer at a fixed price per pound, the difference in price designed to represent a fair compensation to customer for converting feeder or stock cattle into market cattle, and, of course, the greater the weight in pounds at the time of delivery for the market, the greater the profits to the customer. The contention of Flanagan Brothers Company is that their dealings were limited or restricted to fat cattle; that the fact that Flanagan Brothers purchased feeder cattle in 1924 and that the members of the original firm as individuals sometimes made purchases of stock cattle did not affect or alter the limited or restricted nature of the business of Flanagan Brothers Company.

N. B. Harvey, the plaintiff in the trial court, had had many cattle transactions with the Flanagans, frequently selling to them his fat cattle and sometimes buying from them his stock or feeder cattle; at least one of the transactions, in addition to the one which is the subject of this action, involved the "buy back" plan. It is, however, claimed

that it was Flanagan Brothers which sold him the feeder cattle in 1924, but it is notable that in 1925 when the same cattle were ready for market they were taken or bought back by Flanagan Brothers Company, which gave its check therefor. It appears that the different members of the original firm when acting for the partnership, operated in special or particular territory; the county of Pulaski was served for the partnership principally by W. F. Flanagan and sometimes by F. H. Flanagan, his son, a member of the partnership, and sometimes by the two acting jointly.

The transaction which is the basis of this section was made in the spring of the year 1929. There were several conversations or interviews between W. F. Flanagan and F. H. Flanagan and N. B. Harvey, which led to the consummation of the deal. The most important one of these was a meeting of the three at the Elk's Club in Pulaski where N. B. Harvey claims that he was assured by F. H. Flanagan and W. F. Flanagan that he could get the feeder cattle which he needed, seventy-five in number. The transaction progressed to the delivery to him (Harvey) at Wurno, Pulaski county, of sixty of the cattle desired, which were known as the "Mock" cattle. The delivery was made by F. H. Flanagan together with one Scott, and Harvey gave his check to F. H. Flanagan for the purchase price which · was $8,356.82. This took place on the 26th of September, 1929. The fifteen additional cattle were subsequently delivered to Harvey at Dublin, Pulaski county, by W. F. Flangan on October 12, 1929, at which time Harvey gave his check for $1,000.00 in part payment to W. F. Flanagan, and on October 22nd the transaction was closed by the check of Harvey for $1,093.62 to W. F. Flanagan. It was claimed by W. F. Flanagan that the fifteen cattle belonged to him individually and were a part of a herd which he had purchased from one Gardner, and that he had let F. H. Flanagan have them to constitute the number contracted for by Harvey. This is the explanation of the two Flanagans for the manner or method by which the purchaser, Harvey,

paid for the cattle. Harvey protested through the case that he thought and believed, in the particular transaction, that he was dealing with Flanagan Brothers Company through the medium of W. F. Flanagan and F. H. Flanagan as members of the partnership and representing it; that neither F. H. Flanagan nor Scott said anything to him about the cattle being the individual property of F. H. Flanagan. W. F. Flanagan and F. H. Flanagan contended that it was an individual transaction between F. H. Flanagan and Harvey. The correctness of that contention, they asserted, was evidenced by the fact that the original partnership dealt exclusively in fat cattle; that in the precise deal F. H. Flanagan had no authority to bind the partnership by entering into an agreement upon its behalf to sell to Harvey stock cattle on the "buy back" plan.

It appears that in the summer of 1930 the fat cattle market sustained a sharp and devastating decline. The fall approached when the Harvey cattle were ready for the market and it became necessary for Harvey to insist upon the completion of the contract on the part of the partnership to the extent of taking up the cattle and making room for him to install on his farm a new lot of feeder cattle. To this end Harvey notified them that the cattle were ready for shipment. He received a letter dated September 27, 1930, from F. H. Flanagan to the effect that the slump in the market and the general depression caused him to be unable to complete the contract and that he (Harvey) was free to ship the cattle on his own account. Harvey in urging that the terms and spirit of the contract be lived up to, wrote two letters, one to W. F. Flanagan dated September 27, 1930, and the other to F. H. and W. F. Flanagan dated September 30, 1930. The wording and phraseology of these letters is strongly relied upon by the partnership and by the Flanagans individually to sustain the position that it was an individual transaction of F. H. Flanagan with Harvey and that he alone was liable therefor. Harvey sued the four Flanagans referred to, as partners, for the

sum mentioned, having previously sold the cattle on the market at the prevailing price, the sum sued for being the difference between such price and what he would have received if the contract had been carried out or completed, and which sum was the amount of the verdict of the jury.

There is evidence in the case to uphold and sustain the theory of the partnership and also that of the Flanagans. Of this we may mention the fact that the evidence tends to show that F. H. Flanagan did a very considerable business on his individual account through the years embraced herein, buying and selling cattle of both types, lambs and hogs. It is shown that these transactions involved an outlay in excess of $800,000.00 through the term of years mentioned. It is also in evidence that in the year 1927 Harvey bought the "Mock" cattle from F. H. Flanagan upon Flanagan's representation that they were his individual cattle, Harvey paying him in cash for them. It is important to note here that this deal did not involve any credit element. It is also in evidence that F. H. Flanagan made similar deals with other persons upon his individual account.

Upon the part of Harvey, the testimony tends to show that he was not aware of the limitation or restriction of Flanagan Brothers Company as to fat cattle; that before the transaction in question he had occasion to investigate the financial responsibility of F. H. Flanagan which disclosed the fact that he owned no real estate and was not one whom Harvey considered as financially responsible; and that he knew that W. F. Flanagan, J. W. Flanagan and Henry Flanagan were each men who owned very considerable property, real and personal. It was also in evidence that in the year 1929 the partnership admitted buying two lots of fat cattle through F. H. Flanagan who gave his individual check to the owner for the purchase price, the contracts running in the name of Flanagan Brothers Company. F. H. Flanagan's explanation of this was that the firm had no bank account that year.

Thus there were important facts and *indicia* supporting

each theory of the case. It was in evidence that the firm had no office, no headquarters, and no letter or bill heads; that it gave to the public no notice of its formation or its limitations or the private agreements among its members. Nor was it ever formally dissolved. Its general trading was the only notice that the public ever had as to its operations, and the individual transactions of F. H. Flanagan appearing in the record were unknown to N. B. Harvey, unless they became known to him in a casual way.

We do not attempt here to give a full résumé of the evidence but simply sufficient of it to make this opinion intelligible and in the view we take of the case and the disposition we shall presently make of it we refrain from further discussion of the evidence, lest in doing so what we might say could be misconstrued upon a retrial which we think becomes necessary on account of misdirection of the jury by the trial court.

We think instructions numbers 2 and 6 given by the court at the instance of the plaintiff constitute reversible error.

They are as follows:

Instruction No. 2.—"The court instructs the jury that when the existence of a partnership is once admitted, it is presumed to continue until dissolved by the acts of the parties, or by law, and in order to escape liability for the acts of the partners, it being admitted that a partnership existed between W. F. Flanagan, Harry Flanagan, J. W. Flanagan and Frank Flanagan at the time of the contract with the plaintiff, and if the jury believe from the evidence that N. B. Harvey had previously dealt with the partnership, that he had the right to presume that said partnership was in force and that the act of each partner, in the real or apparent scope of the partnership business, was the act of the partnership, and that any private agreement between the partners that they would do business year by year cannot be invoked in this case unless known to the plaintiff and that N. B. Harvey had a right to presume on account

of former dealings with the partnership, if the jury believe from the evidence that he had had such former dealings, that each partner was acting as the agent of themselves and the other partners unless he had notice or knowledge to the contrary, and by the term 'knowledge' is meant knowledge of such facts as in the circumstances show bad faith; and by the term 'bad faith' is meant there must be something in the transaction which would amount to fraud on the part of N. B. Harvey in not pursuing the information disclosed by the circumstances surrounding the transaction."

Instruction No. 6.—"The court instructs the jury that if they believe from the evidence that prior to the contract in question, the defendants formed a partnership for the purpose of buying and selling cattle and that prior to the contract in question the plaintiff had had partnership dealings with the defendants as a firm, that in the year 1929, the plaintiff made the contract in question with one or more members of said firm, reasonably believing that such member or members of the firm were acting for the partnership, that the contract in question was within the apparent scope of the partnership; that the plaintiff had no notice or knowledge, as defined in instruction No. 2, that such member or members of the firm in making said contract were acting in their individual capacity for their own benefit and not for and on behalf of the firm, then under the law the defendants are liable on said contract, and you will, therefore, find for the plaintiff against all of said defendants."

We think that the vice in instruction number 2 is found in the facts:

First: It is confusing in its terms and did not enlighten the jury, as was its evident primary intention, because it purported in the beginning to tell the jury what conditions and requirements should obtain in order for the admitted partnership to escape liability for the acts of its partners. As a matter of fact it fails to do this and instead of following up the thought it branches off into other matters. In other words, it is disconnected and misleading.

Second: It injects into the case an issue which is not justified by the evidence. In defining knowledge upon the part of the plaintiff it employs the term "bad faith," which may not be objectionable as a part of a legal definition, but is decidedly so, we think, when incorporated in an instruction in this case, and we cannot say that the jury was not misled by it. Certainly it was not necessary for the jury to believe that the plaintiff was guilty of bad faith or fraud in not pursuing an inquiry leading to further information, before they could find a verdict in favor of the defendants.

■■ Instruction number 6 is subject to serious criticism, principally because it is expressly tied up with instruction No. 2, which we have already pointed out as erroneous, and the connection between the two emphasized the foreign issue injected into the case by the former instruction. Upon the question of misleading and confusing instructions, see *Atkins* v. *Com.*, 132 Va. 500, 110 S. E. 379; *Pocahontas Con. Collieries Co.* v. *Hairston*, 117 Va. 118, 83 S. E. 1041.

In *Scott's Ex'r* v. *Chesterman*, 117 Va. 584, 85 S. E. 502, 512, it was said: "It has been too often ruled by this court to need citation of authority, that any instruction calculated to mislead the jury, whether it arises from ambiguity or any other cause, ought to be avoided; and if given it will oblige the appellate court to reverse the judgment."

■ Both of the above instructions, we think, are in conflict with instruction "A" which was granted by the court at the instance of the defendant and which aptly and correctly presents the law of the case within its limitations. Instruction "A" is as follows:

"The court instructs the jury that to find the defendants liable as partners in this case, the jury must believe from the evidence either—

"(1) That the defendants were in fact, partners in the transaction in question; or

"(2) That the plaintiff was led to believe by the rep-

resentations or conduct or both of the defendant or defendants actually taking part in the transaction that they were acting for the partnership, and that the representations and conduct of the defendants were such as to reasonably justify such belief on the part of the plaintiff; or

"(3)    That the transaction in question was according to the usual course of dealing of the partnership as known to plaintiff, and that plaintiff reasonably believed he was dealing with the partnership, and that the defendant knew, or in the exercise of reasonable judgment should have known, that the plaintiff believed he was dealing with the partnership."

We find no reversible error in the remaining instructions. It follows that we reverse the judgment of the trial court and remand the case for new trial to be had not in conflict with the views herein expressed.

*Reversed and remanded.*