**JOHN W. JOHNSON, INC., Plaintiff,**

v.

**J. A. JONES CONSTRUCTION COMPANY, Defendant and Third-Party Plaintiff.**

**The AETNA CASUALTY AND SURETY COMPANY, Defendant,**

v.

**The CITY OF RICHMOND, VIRGINIA, Third-Party Defendant.**

Civ. A. No. 17–72–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Nov. 1, 1973.

George G. Grattan IV, and Paul G. Turner, Richmond, Va., for plaintiff.

John M. Oakey, Jr., McGuire, Woods & Battle, Richmond, Va., for defendant and third-party plaintiff.

William L. Wimbish, Asst. City Atty., and William F. Hazen, Richmond, Va., for third-party defendant.

## MEMORANDUM

RICHARD E. ROBINSON, Senior District Judge (Serving by Assignment).

This matter comes before the Court, after having been tried to the Court without a jury. This Memorandum shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

The jurisdiction of this Court is invoked under 28 U.S.C.A. Sections 1332, 1441 and 1446. The plaintiff is a corporation incorporated under the laws of the District of Columbia having its principal place of business in the District of Columbia. The defendant, J. A. Jones Construction Co., is a corporation incor-

porated under the laws of Delaware having its principal place of business in North Carolina, the defendant, Aetna Casualty and Surety Company, is a corporation incorporated under the laws of Connecticut, having its principal place of business in Connecticut. The defendant, City of Richmond, is a public body politic and corporate of the State of Virginia. The amount in controversy exceeds the amount of $10,000.00 exclusive of interest and costs.

## I

The action arises out of the construction of a coliseum in the City of Richmond, Virginia.

The defendant, J. A. Jones Construction (hereinafter referred to as the "Contractor") was awarded the contract by the defendant, City of Richmond, to construct the coliseum, and the defendant, Aetna Casualty and Surety Company executed a performance and payment bond.

The plaintiff, John W. Johnson, Inc., (hereinafter referred to as the "Painter"), entered into a subcontract with the Contractor for painting services for a lump sum bid of $85,905.00 which was adjusted upwards to $91,755.00.

This lawsuit was precipitated primarily by a controversy regarding the position of the City's architect that certain painting was to be deleted which as a result would reduce the work required of the painter and reduce the contract price and from a problem with regard to inspection of the touch-up of the structural steel. The City withheld payment from the Contractor who withheld payment from the Painter. The Painter has been paid $72,198.00.

There are also a number of other claims in this action and although all of the claims arise from the painting of the coliseum each claim involves a separate transaction and requires a separate analysis. Generally the Plaintiff asserts the following claims against the Contractor:

A claim for the additional expenses resulting from an alleged failure to clean and light, and to obtain proper inspection of the painting of the structural steel; a claim for additional compensation for painting of a catwalk and side-plates which had been installed, in lieu of painting it on the ground prior to installation; a claim for alleged improper interference with the Painter's work schedule; a claim for additional compensation for painting pipe under four bridges; a claim for four minor change orders, and a claim for alleged loss of profits.

The Painter has also filed a claim against the City directly on a tort claim for interference with the Painter's contractual relationship with the Contractor and under a statutory provision.

The Contractor has denied liability and filed a counterclaim against the Plaintiff Painter generally claiming as follows:

A claim for additional touch-up painting done after the Plaintiff Painter left the job and a claim for painting pipe and pipe hangers after the Painter left the job.

The Contractor has also filed a cross-claim against the City for liability over in event the Contractor is liable to the Painter.

## II

The Architect's role is threaded throughout this litigation so the Court will at the threshold discuss the scope of judicial review to be accorded the decisions of the Architect under the facts and circumstances of this case.

Section 2.2.7 of the General Conditions of the Contract, pg. 4 as amended by Section 1.3.2 of the Supplementary General Conditions, pg. 1 of 11, provides as follows:

"Claims, disputes and other matters in question between the Contractor and the Owner relating to the execution or progress of the Work or the interpretation of the Contract Documents shall be referred initially to the Architect for decision which he will render in writing within a reasonable

time, which decision shall be final and binding on both Contractor and Owner." (JX–1).

Thus there are two general categories for which the Architect's decision is, by the plain language of the contract, made "final and binding on both Contractor and Owner."

■ The first category, relating to the execution or progress of the work involves generally factual decisions. It is settled that the parties can agree to make the Architect's decision "final" as to the first category. The jurisdiction of the Court to review the decision is not ousted, but the scope of review is limited or restricted.

In Main v. Department of Highways, 206 Va. 143, 150, 142 S.E.2d 524, 529 (1961) the Circuit Court agreed with the lower court's holding that a section of the specifications

"which provides that the Commissioner shall decide all questions which may arise as to the character, quality, amount and value of any work done and material furnished, and that 'his estimates and decisions upon all claims, questions and disputes shall be final and conclusive upon the parties thereto' "

and was

"valid and binding on the parties, in the absence of any allegation that the Commissioner was guilty of fraud, bad faith, or had exceeded his authority."

The Supreme Court of Virginia affirmed the judgment sustaining the defendant's demurrer. The Court further stated that

"Similar provisions are frequently embodied in building and construction contracts and are generally upheld . . . [and] (t)he fact that the Commissioner is made the arbiter does not affect the validity of the agreement. . . ."

In Ballou v. Basic Construction Company, 407 F.2d 1137, 1141 (4th Cir. 1969)

"the architects . . . had the final authority to accept or reject the work."

The subcontractor was not excused from meeting its contractual obligation to fabricate columns in strict conformity with the specifications even though:

"the manufacture of . . . acceptable columns might have been extremely difficult or so expensive as to consume any profit the contractor may have contemplated."

The Court further observed that:

"the architects' decision to enforce literal compliance with the contract may have reflected poor judgment or excessive rigidity, but there (was) no evidence or even suggestion that they were motivated by malice or bad faith."

The second category, relating to the interpretation of contract documents involves generally questions of law. Both *Ballou, supra* and *Main, supra* involved a dispute over work performed pursuant to the undisputed terms of the contract documents and did not, strictly speaking, involve the problem of interpretation and construction of the terms of the contract documents.

This was found to be a distinction without significance by Mr. Justice Black in United States v. Moorman, 338 U.S. 457, 461–462, 70 S.Ct. 288, 291, 94 L.Ed. 256 (1949) holding that "a conclusion that the question here is one of law" would not prevent the parties from contractually agreeing to have disputes submitted to final determination outside the courts provided the interpretation of the parties was manifest by the plain language of the contract. Of course, this "final" determination was qualified by the statement that

"Findings of such a contractually designated agent, even where employed by one of the parties, were held 'conclusive, unless impeached on the ground of fraud, or such gross mistake as necessarily implied bad faith.' . . ."

■■ Virginia law is controlling as to the substantive law of this action and the Architect's authority, even when his decisions are to be final and conclusive, is limited by the holding of City of Richmond v. Barry, 109 Va. 274, 63 S.E. 1074 (1909). Although the City's engineer had been given authority to make "final and conclusive" decisions it was held that he could not give a decision contrary to a custom or trade usage which had been read into the contract and made a part of the contract.

In this case the Subcontractor or Painter argues that it is erroneous to contend that the City's architect is the exclusive interpreter of the subcontract because Article 24 of the subcontract provides for arbitration as follows:

"If any question shall arise concerning the work under this Sub-contract, or concerning the settlement of accounts in connection therewith, either party hereto may demand immediate settlement by reference to a Board of Arbitration. . . ." (PX–19).

However, Article 3 of the subcontract provides in part that:

"It is understood and agreed by and between the parties hereto, that the work included in this Sub-contract is to be done under the direction of said Architect or Engineer, and that his decision as to the true construction and meaning of the plans and specifications shall be final."

■■ The Court must construe the provisions so as to give proper meaning to each article. If Article 24 is interpreted to permit a resort to arbitration of all of the Architect's decisions then Article 3 is reduced to a nullity. On the other hand if Article 24 is limited to only the Architect's decisions as to factual decisions as to whether work has been properly accomplished, or as to amounts of work done, and not read to include decisions as to the construction of plans and specifications then both provisions are given their proper meaning.

This construction of the subcontract is further reinforced by the explicit reference to "Arbitration" and to Article 24 in Article 5 of the subcontract which provides:

"Article 5—The Sub-Contractor hereby agrees to make any and all changes, and furnish the materials and perform the work, that the Contractor may require, without nullifying this agreement at a reasonable addition to, or deduction from, the contract price, hereinafter named, and pro-rata to the same, i. e., figured on original unit price where applicable. No alterations or changes shall be made, however, except upon the written order of the Contractor. The amount to be paid by the Contractor or allowed by the Sub-Contractor by virtue of such alterations shall be stated in such order, if such amount can be agreed upon, together with any change in contract time. Should the Contractor and Sub-Contractor fail to agree as to the amount to be paid or allowed, the work shall proceed under the order required above, and the final determination of such amount shall be referred to a Board of Arbitration, selected as provided for in Article 24."

There is no reference to arbitration or Article 24 in Article 3 (which refers to the construction of the plans and specifications).

### III

The Court will now address the claim for the additional expenses resulting from an alleged failure of the Contractor to properly clean and light the structural steel thus precluding a proper inspection, and hindering painting.

Under the specifications the Painter was required to perform touch-up painting of structural steel and one field coat. The Contractor was required to clean the structural steel and to provide light for the painting. The specifications with regard to lighting provide:

"The General Contractor shall provide adequate heat, electric power and suf-

ficient light in the area of work in order that this contractor may perform his work in an acceptable manner. Sufficient light shall not mean provisions for extension cord and drop light assembly, but sufficient light shall mean light of approximate intensity and distribution that will be provided in each area at completion of project. (JX–1, Vol. 2, Sec. 9F.03 (b), p. 9F–2–7)."

The facts do establish that the Contractor provided superior lighting to that which was provided by the permanent lights in the area of the structural steel at the completion of the project. This is due to the fact that no permanent lights were installed in the structural steel which is located high in the top part of the coliseum. However, the specifications required sufficient light to enable the work to be performed in a suitable manner. In this instance the provisions of the specifications conflicted and obviously the Architect resolved the conflict in a reasonable manner by requiring more light than was to be provided by the permanent lights.

In addition, it was clearly established that the cleaning of the structural steel was a problem. Robert Welch the Contractor's project engineer testified that:

"Q. Was the steel clean?

A. We attempted to clean the steel at the insistence of the architect and clerk of the works. It was a long subject of controversy and I think it was blown way out of proportion.

Q. How much of a problem was it while you were doing it?

A. It was an awful problem to clean. It is a very difficult task. And we used different methods, used air.

Q. Was it ever cleaned?

A. Not in its entirety. We cleaned at it, and it was never cleaned in its entirety." (TR–380).

The Court finds that the Contractor did not properly clean the structural steel although the Contractor approached the problem in good faith and made sincere efforts to remedy the problem. The structural steel had been exposed for a long period and accumulated much dust and dirt. (TR. 303, 379).

The Architect also testified that the lighting did hamper both the Painter in painting and the Clerk in his inspection (TR. 446, 419–420). The Architect never did accept the work and the Owner received a credit from the Contractor for the deficiency. (TR. 447).

Although there was testimony that the Architect or his representative was unduly strict the Court cannot conclude that the Architect was arbitrary, capricious or clearly erroneous in his judgment with respect to this claim.

Robert Welch, Jr., a project manager, testified that:

"Q. Did you encounter certain frustrations in getting the steel inspected?

A. We did.

Q. What were the nature of those frustrations?

A. Acceptance or review by the architect, and primarily his representative Mr. Beasley.

Q. What were the specific nature of those problems?

A. That the architect, excuse me, he couldn't see the steel, that he couldn't tell whether it was painted or not.

Q. Why did he say that?

A. I don't know why he said that. It was perfectly obvious to everybody there that the steel was painted and it was just a continuing problem with him. Said there wasn't enough light at times. That they had stuff on it and it was just a completely frustrating experience." (TR–419).

The Court finds that the Contractor failed to clean the steel properly and initially failed to provide proper lighting, and that these failures hind-

ered the inspection and touch-up painting of the steel. The Architect's decision not to accept the painting as in compliance with the specifications may have reflected poor judgment or may have been excessively rigid. However, there was no credible evidence which establishes that the decision of the Architect was motivated by malice or bad faith. The Court will not substitute its judgment for that of the Architect.

■ The Painter was hindered in its work and was required to do extra work as a result of the lighting and cleaning problem. The Plaintiff did not contribute to nor cause the problems and the burden for the extra cost must fall on the Contractor.

As the Defendant Contractor, J. A. Jones Construction Co., stated in its brief that "the real reason this problem arose was because of the nature of the building, the difficulty in constructing it, and the extra risks involved." Be that as it may the risk in this instance fell on the Contractor and it must bear the extra costs incurred and those caused to the Plaintiff.

■ The damage issue is troublesome. The burden is on the Plaintiff to establish the damages. The Plaintiff contends that the failure to clean and illuminate the structural steel adequately and to obtain timely acceptance of the work by the City compelled approximately two circuits (trips) around the days in question instead of one. The only direct testimony on this point was from John W. Johnson, President of the Plaintiff who stated: "my recollection is it is about $7,785. I am not sure of that amount." (TR–19).

■ The Court finds that the Plaintiff's President did tend to inflate his claim with regard to damages. It is clear, however, that the Plaintiff did sustain substantial damage and uncertainty as to the exact amount of damages does not preclude recovery. Manss-Owens Co. v. Owens & Son, 129 Va. 183, 105 S.E. 543 (1921). The Court finds that the Plaintiff sustained damages in the amount of Six Thousand Dollars ($6,000.00) on this claim.

IV

The Court now turns to the issues concerning the claim for additional amounts for painting catwalks and catwalk side-plates in the air.

There is no dispute that certain portions of the catwalks and side-plates were painted in the air. It is also not disputed that additional compensation could be due the Painter if the painting were done in the air.

The Sub-contract between the Painter and the Contractor provides in part that:

"Should this subcontractor (painter) be prevented by weather conditions or erection schedule from painting structural steel prior to the erection, the following amount will be added to the sub-contract amount for that portion that is painted after erection." (PX–19).

A letter from the Contractor to the Painter, dated October 7th, 1969, refers to this provision and adds:

"We also acknowledge that if you are prevented from exercising this option by J. A. Jones Construction Company, additional compensation will be due (limited to a maximum of $23,400)."

(Defendant's Exhibit labeled as PX–95). The letter also provides:

"Due to limited space for structural steel erection by our Subcontractor, Bristol Steel and Iron Works, and the importance of a continuing operation of structural steel erection, it is important that all possible cooperation and efforts be made by you in preventing any delays to this operation . . . (and) any additional costs . . . will only be considered after you have made all possible efforts to cooperate in full in preventing delays . . . and subsequently directed (sic) by J. A. Jones Construction Company to proceed contrary to your elected option." (PX–95).

Mr. Alavanja, the Painter's foreman concerned with painting the catwalk, testified that he was not directed by the Contractor to paint it in the air (TR–99 and 102) and that the Contractor had made room on the ground to enable painting on the ground when requested but that the catwalks were erected before it could be painted. (TR–105).

Mr. Leonard, the project manager, provided the following testimony in his deposition:

"Q. Now focusing on the fall of 1970-winter of 1971 period, did it become necessary during that period that certain catwalks be painted in the air?

A. In the fall of—

Q. Yes, the fall of 1970 and the winter of 1971?

A. I am almost certain that the catwalks were painted in the air, yes. But how many, to what extent, it would be pretty difficult to say.

Q. Would this have been because of the temperaure situation and the scheduling of the ironworkers for the erection of the steel?

A. I believe it was more of a scheduling problem with rain than anything else. I am not certain. I know that we had some difficulties that the steel was wet, we couldn't paint it, so we erected it.

Q. And would that mean that the painter would be compensated extra for doing that?

A. Yes, sir, anything painted in the air he is to be compensated for provided, as pointed out in that letter, it wasn't due to his own actions.

Q. Do you recall any actions of his that would have caused the thing to happen?

A. There were a few times—if you will check, I am not certain if it is in the correspondence or not —where we called for men. But it was only one or two times. It wasn't very many." (TR–60–61).

The Court finds that the Painter did not cause any delay by its actions and was prevented from painting the catwalk and side-plates on the ground. The Court further finds that the Painter need not show that the Contractor expressly directed that the catwalk be painted in the air. The Contractor's letter explicitly provided:

"We also acknowledge that if you are prevented from exercising this option by J. A. Jones Construction Company, additional compensation will be due. (PX–95)."

The Court finds, however, that the Painter's figure submitted for damages is too high. The figure quoted was a maximum figure, and an estimate. Although actual figures were alluded to by Mr. Johnson no records, time sheets or calculations were introduced into the record to support the claim for damages on this claim. There was credible testimony that no additional costs would be incurred by some of the painting in the air.

Mr. Askins, superintendent for the steel erectors testified:

"A. Well, it was about painting the shields before they went in the air and August and myself talked about it. And it wasn't a whole lot of room to lay the shields out in the Coliseum floor to get them painted. And talked about painting them after they were erected with a roller. And the conversation we had was about that. He figured well probably that was the best way to do it.

Q. Who did?

A. August.

Q. Right
How did he do it?

A. I don't really remember now how he did paint it, but that conversation we had was painting, he

was going to use a roller because we had the catwalk and everything up and you just reach over and roll the thing.

Q. What position did you take in the conversation?

A. I don't follow you.

Q. Did you make any statements to him as to how it should be painted?

A. Well, I talked to him about it, it would be easier, it seemed like to me, to paint it that way, of course.

Q. Did he agree with you?

A. Yes, he agreed that it would be easier to paint that way. (TR. 265–266)

Mr. Wilbor, employed by Painter not a party to this action testified that:

"Q. I won't ask you about the catwalk framing, but as to the side plates, can you give us an opinion as to any difference in costs as to painting them on the ground or in the air?

A. Well, in painting the side plates on the ground of course these would have to be moved around. They would have to be stacked. Then after, say, you did paint them on the ground, after they were erected, then you would normally have to touch them up again. Now, with these erected then you would not be involved with moving them around or having to retouch them up or touch them up once they were painted.

Q. Is the touchup required under the contract?

A. I would assume so. We have always done that in the past, had to do it in the past.

Q. How about the frame, how would you paint that, do you know?

A. The frame on the catwalk I would say you probably would have to scaffold that. I didn't

look at it as to say it would be done this way or that way.

Q. Would it cost any more to paint the side plates alone in the air?

A. I wouldn't think so, no sir." (289).

The Court finds that only a portion of the painting of the catwalk would require scaffolding and result in extra cost to the Painter, and that the weight of the credible evidence establishes damages in the sum of $3171.35.

V

The Court finds that the Plaintiff has failed to fulfill its burden of proof of establishing any damages from an alleged interference with the Painter's work schedule. It is the Plaintiff's contention that on April 16, 1971, the Contractor directed the Painter to meet a June 12, 1971, completion date.

The Painter has not established that the Contractor deliberately set a false completion date knowing it to be unattainable. There is testimony that a beneficial occupancy date of August 20th, 1971, was a commitment as early as March, 1971, but this refers to the entire project, not merely the painting phase (TR–420). Moreover the Plaintiff has failed to establish by a preponderance of the credible evidence any extra expenses were accrued. The Court finds that extra costs, if any, were *de minimis*. The Court rejects the testimony as to damages by Mr. Johnson on this point as unsubstantiated and unrealistic. It was admitted that the Painter did not have any men idle or do any extra work during the period in question. (TR–66 and 90).

VI

The Court concludes that the Plaintiff is not entitled to recover on the claim for painting the pipes under the bridges.

The sub-contract provides that the Painter was required to "(p)erform all painting work in strict accordance with the plans and Section 9F Painting of the Specifications."

Section 9F.02(c) of the Specifications provides that:

"The Contractor shall examine the specifications for the various other trades and shall thoroughly familiarize himself with all surfaces that are left unfinished by the requirements of other specifications shall be painted or finished as part of this Contract (sic)" (JX–1, Vol. 2 p. p. 9F–1–7).

█ It is arguable that the specifications with reference to the pipe under the bridge required the painting to be by the subcontractor responsible for the installation of the pipe. The Court cannot conclude, however, that the Architect was arbitrary or clearly erroneous in interpreting the specifications to the contract.

Section 2#.02(f)(1) provides in part that:

"Painting shall be in accordance with Division 9 of these specifications." (JX–1, pg 2H–2–9).

It is the Painter's position that "in ccordance with" simply means that the provision of Division 9 pertaining to the manner of painting (type of paint, coats, etc.) apply and does not define the responsibility of painting with respect to the Plaintiff. The Plaintiff argues that the term "under" would have been used in lieu of "in accordance with" if the painting sub-contractor was required to do the painting. The Painter, however, never requested a clarification of the terms and it is clear that the pipes were to be painted by someone.

The Painter's President admitted that he initially painted pipes under two bridges without expecting any additional compensation, and would not have objected had the other claims not arisen. Thus it is clear that the Painter was aware of the need for clarification prior to the time the work was done. The Contractor never issued a written order to paint the pipes under the bridges. The subcontract provides that "no alterations or changes shall be made, however, except upon the written order of the Contractor." (PX–19, pg 2). The Court

holds that under the circumstances of this case the failure to obtain a written order bars recovery. The Plaintiff's President admits in effect he was aware that there could be a controversy over this painting. He could have insisted in advance upon a written order, or requested a decision in advance by the Architect.

█ The plaintiff failed to take any such steps. It cannot now recover in the absence of a written order directing the work to be done.

## VII

The Defendant Contractor concedes that the Painter should have been paid for the following claims:

The flagpole in the amount of $660.00;

Field Order # 174 in the amount of $220.00;

Bulletin # 173 in the amount of $40.00 and

Bulletin # 119 in the amount of $223.00.

Bulletin # 115 is not conceded. The Court finds that the Plaintiff is not entitled to this claim in the amount of $80.00. The credible evidence establishes that this work was done by N. Chasen & Sons, not a party to this contract, and not by the Plaintiff Painter. (TR 148 and 401).

## VIII

The Plaintiff contends that there is an uncontested balance due under the terms of the contract from the Contractor in the amount of $19,557.00. While it is uncontested that said sum has not been paid, it is contested that said sum is due. This sum was not paid because the Architect issued Bulletin 86 which requested a credit for the deletion of the painting of ducts in spaces 500 and 600 (DX–36). It is the Plaintiff's position that this painting was not required by the contract and thus no credit should be given. At the trial both the Contractor and the City took the position that the duct work was in the contract and that deletion would therefor be a basis for a credit.

The Architect's decision and rationale on this matter is set forth in a document issued on March 7, 1972. (DX–30). The Architect reasoned that Section 9F.02 of the Contract specifically requires the General Contractor to examine the other sections of the specifications which have deleted painting requirements by the Sub-Contractor installing the equipment. This work is then to be included in the painting section and would be the responsibility of the painting subcontractor.

 The Court does not take issue with the Architect's decision that the Painter was to perform the painting deleted from the requirements of the other subcontractors. But the sections relating to this division of work simply do not have any force and effect unless and until there is a basis to conclude that any painting is to be done at all.

 There was evidence introduced that the Contractor agreed with the Plaintiff's position prior to trial. PX–10 was introduced over a hearsay objection which is a letter on its face stating in part that:

"Our review of all specific painting requirements include Paragraph 9F.-08(b) 1(a) and 1(b), room finish schedule on Drawings 56 and 57, and the Master Color Schedule does not indicate painting of duct work. We, therefore, concur with the Painting Subcontractor that no credit is due for areas not included in the original Contract."

While admissible as an admission against interest the Court does not rely on this evidence. This issue must be determined by the Court from an examination of the contract documents, terms, specifications, and drawings.

 The decision of the Architect should be considered as final unless it is established the Architect was guilty of fraud, bad faith, or had exceeded his authority.

9F.02(c) provides:

"The contractor shall examine the specifications for the various other trades and shall thoroughly familiarize himself with all surfaces that are left unfinished by the requirements of other specifications shall be painted or finished as a part of this contract. This especially applies to interior surfaces of heating convectors and baseboard radiation visible in the finished installation if present; exposed mechanical duckwork, door grilles, roof ventilators and equipment and electrical switch plates if manufactured of a material other than materials that are specified not to be painted." (sic)

However, 9F.02(a) provides:

"The following specifications cover the complete painting and finishing of all wood, masonry block, unfinished metal, hard plaster and other specified surfaces throughout the interior and exterior of the building, except as otherwise specified herein or noted on the drawings."

Thus it is indicated that the drawings are to be referred to in determining the scope of the painting. If the area in question is not to be painted the sections pertaining to the division of the painting between the various subcontractors obviously have no application.

The drawings clearly establish that items in areas 500 and 600 were to be painted only if specifically designated in the drawings or final schedule.

 The drawings required only the painting of the catwalk in area 500. Where duct was to be painted in other areas it was indicated by the abbreviation "PT". There is nothing in the remarks column that would call attention to the painting of the duct in areas 500 and 600. The Court finds that the credible evidence also established that the custom and trade usage does not require that piping, or ductwork, be painted in unfinished areas unless specifically called for either in the specifications or drawings. The Court finds that areas 500 and 600 were to be unfinished areas. Even though the Architect's decision is to be final he cannot ignore the custom and trade usage in rendering a decision.

This has to be read into the contract. There is no provision or term of the contract which expressly or impliedly rejects or alters this custom and usage of the trade in this action. Moreover Section 9F.02(a) of the specifications supports the conclusion that this custom or trade usage is applicable. It follows that the decision of the Architect was in excess of his authority. The Architect was not authorized by any term of the contract to render a decision which was clearly erroneous and contrary to the terms of the contract. The Court is not merely resolving doubts against the Architect, but rather finds that the decision of the Architect was clearly contrary to the terms of the contract and was clearly erroneous. The Court finds the Architect was not authorized by the parties to ignore terms of the contract in rendering a decision and that the Architect was in excess of his authority in this instance.

The Court finds that the Plaintiff was not required to paint the ductwork in areas 500 and 600 and was not required to give a credit for such purported deletion of such painting.

## IX

After full consideration of all of the evidence the Court finds that the Plaintiff has wholly failed to prove by a preponderance of the credible evidence that it has suffered a loss of profits.

The general rule is stated in Boggs v. Duncan, 202 Va. 877, 121 S.E.2d 359, 363 (1961):

"It is well settled that damages are recoverable for loss of profits prevented by a breach of contract 'only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.' . . . *Moreover,* profits which are remote, speculative, contingent or uncertain are not recoverable."

This rule is supplemented by the recent case of Mullen v. Brantley, 213 Va. 765, 195 S.E.2d 696, 699, 700 (1973), which provides:

"When an established business, with an established earning capacity, is interrupted and there is no other practical way to estimate the damages thereby caused, evidence of the prior and subsequent record of the business has been held admissible to permit an intelligent and probable estimate of damages.

"But where a new business or enterprise is involved, the rule is not applicable for the reason that such a business is a speculative venture, the successful operation of which depends upon future bargains, the status of the market, and too many other contingencies to furnish a safeguard in fixing the measure of damages."

The Plaintiff's claim is entirely predicated on its claimed loss of ability to obtain a performance bond due to lack of working capital.

The Plaintiff's business is not a new business, but the factors which necessarily enter into whether the Plaintiff would have made more profits (or losses) are far more speculative than those described in Mullen v. Brantley, *supra.*

The Plaintiff's direct testimony about several possible jobs provides the Court with no credible basis to award damages on this item. It was self-serving and no details or corroboration of the jobs were presented. It is entirely possible that the Plaintiff would have lost money on these jobs as it is that it would have made money. In short the Plaintiff has failed to present credible evidence establishing to a reasonable certainty that any substantial damages for lost profits have been suffered, let alone the amount of the damages.

## X

The Court finds that the Defendant Contractor has failed, with several exceptions, to establish its counter-claim against the Plaintiff. The Court finds that prior to the time the Plaintiff Painter had left the job the Painter had substantially completed all of the requirements under the contract and change orders. There were two excep-

tions: the ambulatory grills at $838.28 and general touch up at $1803.51. There was conflicting testimony about the ambulatory grills but the Court finds that the Defendant Contractor has established this claim by a preponderance of the credible evidence.

The Court in examining Defendant's Exhibit 27–C finds that there is some clerical error in the calculations with reference to touch-up painting. The total claim is for $2025.76 including 236 hours of labor. Yet examination of each time sheet discloses that substantial amounts of time were for touch-up and painting of pipes and hangars in areas 600 and 500. These items have been crossed off the time sheet exhibit and deducted only in part from the total hours claimed. The Court finds that additional deductions should have been made and that the hours thus computed total only 180 hours instead of 236 hours At 8.20 per hour this computes to be $1476.00 plus $90.56 for materials. The other general touch-up costs are established to be $236.95 (DX–27B). The Plaintiff was obligated under the contract to complete these items prior to leaving the job as the evidence establishes this work was unrelated to the controversy over areas 500 and 600.

### XI

The Court finds that a controversy with Bristol Steel (not a party) and the Plaintiff had been compromised and settled.

### XII

The Court finds that the pipe and hangars in areas 500 and 600 were not required to be painted under the contract for the same reasons as stated with respect to the ductwork in areas 500 and 600. There is no meaningful distinction to be made between these items in the analysis of the painting requirements of the Plaintiff.

### XIII

The Court finds that the Contractor is entitled to recover $15,000.00 from the third-party defendant, City of Richmond. This represents the sum withheld by the City for the claimed credit for the purported deletion of the painting of the duct in areas 500 and 600. Originally $30,000.00 had been withheld but this was later reduced to $15,000.00. (TR–227).

The Court finds that the Defendant Contractor is not entitled to any further recovery because the credible evidence does not establish that the Architect was guilty of fraud or bad faith.

### XIV

In summary, the Court finds that the Plaintiff, John W. Johnson, Inc. has established by a preponderance of the credible evidence that it is entitled to recover $29,385.35 on its claim against the Defendants J. A. Jones and The Aetna Casualty and Surety Company.

The Court finds that the defendant, J. A. Jones, has established by a preponderance of the credible evidence that it is entitled to recover $2,878.74 on its counter-claim against the Plaintiff, John W. Johnson Inc.

The Court finds that the Defendant and Third-Party Plaintiff, J. A. Jones Construction Company, has established by a preponderance of the credible evidence that it is entitled to recover $15,000.00 on its crossclaim against the Third-Party Defendant, The City of Richmond, Virginia.

The Court finds that the Plaintiff, John W. Johnson, Inc. has failed to establish by a preponderance of the credible evidence that it is entitled to any recovery on its claim against the Defendant, City of Richmond, Virginia, and this claim should be dismissed with prejudice.

### ON MOTION FOR RELIEF FROM JUDGMENT

This matter comes before the Court upon the Motion of the Third-Party Defendant, The City of Richmond, Virginia, for relief from the $15,000 judgment entered against it on November 5th, 1973.

 The motion is made pursuant to Rule 60[b] of the Federal Rules of Civil Procedure. The Court finds that the motion was made within a reasonable time within the meaning of Rule 60[b] of the Federal Rules of Civil Procedure. The motion was filed less than thirty [30] days after entry of judgment. *See* Caraway v. Sain, 23 F.R.D. 657 [N.D. Fla., 1959].

Rule 60[b] provides in pertinent part that:

"On motion and upon such terms as are just, the court may relieve a party . . . from a final judgment . . . for the following reasons: . . . [5] The judgment has been satisfied . . . or it is no longer equitable that the judgment should have prospective application."

It had been alleged that the City of Richmond, Virginia, had withheld sums from the Third-Party Plaintiff as an estimate of value for which credit was claimed to be due for the deletion of painting of duct in certain areas which were in controversy. The City of Richmond, Virginia, admitted in its answer that it was withholding sums for credit due.

The matter was tried to the Court without a jury and the Court found that:

"[T]he contractor is entitled to recover $15,000 from the Third-Party Defendant, City of Richmond. This represents the sum withheld by the City for the claimed credit for the purported deletion of the painting of the duct in areas 500 and 600."

The Third-Party defendant, The City of Richmond, Virginia, has attached, and made a part of the motion, Interrogatory 25, and the response thereto in which it is stated that no amounts were being withheld with respect to this action. At the trial the City's architect testified to the contrary but was apparently mistaken or misinformed. The Third-Party Plaintiff, J. A. Jones Construction Company, has informed the Court that it concurs with the statement and the sums withheld with respect to this action have been paid to the J. A. Jones Construction Company.

The Court finds that the judgment heretofore entered against the City of Richmond, Virginia, has been satisfied and the Court further finds that it is no longer equitable that the judgment should have prospective application. A Separate Order will be entered.