SWEENEY COMPANY OF MARYLAND, Plaintiff-Appellee,

v.

ENGINEERS–CONSTRUCTORS, INC.; Rentenbach Constructors, Inc.; Federal Insurance Company; Defendants-Appellants,

United States Fidelity & Guaranty Company, Defendant-Appellee.

No. 86–2670.

United States Court of Appeals, Fourth Circuit.

Argued May 6, 1987.

Decided July 20, 1987.

Samuel Walter Hixon, III (Stephen E. Baril, William R. Mauck, Jr., Williams, Mullen, Christian & Dobbins, on brief), Richard T. Sowell (Baker, Worthington, Crossley, Stansberry & Woolf, on brief), for defendants-appellants.

Howard Gary Goldberg (Ralph L. Arnsdorf, Smith, Somerville & Case, on brief), for plaintiff-appellee.

Before PHILLIPS, ERVIN and WILKINSON, Circuit Judges.

ERVIN, Circuit Judge:

This case concerns the justification necessary for and the damages flowing from the termination of a construction subcontractor by the general contractor. Appellants Engineers-Constructors, Inc., Rentenbach Constructors, Inc., and Federal Insurance Company (collectively "RCI") appeal the decision of the district court, sitting without a jury, that RCI wrongfully terminated a subcontractor, appellee Sweeney Company of Maryland ("Sweeney"), on a construction job in Richmond, Virginia.

The district court also found against RCI on its counterclaim against Sweeney and its bonding company, United States Fidelity & Guaranty Company, for breach of Sweeney's subcontract arising from Sweeney's alleged failure to carry out assigned work and to staff the project within the terms of the subcontract. The court entered judgment in favor of Sweeney in the amount of $261,347. This appeal followed. We vacate the judgment for the subcontractor, Sweeney. We remand for more detailed findings of fact on the extent of Sweeney's obligations under the subcontract and a more explicit statement of the amount that RCI owes for the termination, if it is deemed wrongful on remand.

## I.

This construction dispute arose over work done on the Medical Hospital of Virginia, North Hospital, a part of Virginia Commonwealth University. The project involved the renovation of the twelve-floor North Hospital and construction of a new tower beside the old hospital, so that the facilities would appear from the inside to be one structure. RCI was the general contractor for the $20 million project. Federal Insurance Company issued a payment bond on behalf of RCI. Sweeney was awarded a $1.3 million subcontract for the construction and installation of drywall, acoustical ceiling, spray fire proofing and other miscellaneous work.

The terms of RCI's contract with Virginia Commonwealth University were incorporated by reference in the subcontract between RCI and Sweeney, which was dated August 3, 1983. The subcontract also provided for the event of termination:

5. TERMINATION: If the Subcontractor fails, refuses or neglects to carry out the work of the Subcontractor as defined herein in accordance with this Subcontract Agreement and the Contract Documents or otherwise to perform in accordance with this Subcontract Agreement and fails within five (5) days after receipt of written notice to commence and diligently and promptly continue to correct such default in performance, the Contractor may without prejudice to any other remedy it may have, terminate this Subcontract Agreement....

App. 373. On August 30, 1985, RCI terminated Sweeney's subcontract. The events that transpired between the awarding and the termination of the subcontract are the subject of radically different accounts by the parties in this case. We turn to the district court's memorandum opinion for the light it sheds on the facts.

The project appeared to the district court to be marked from the beginning by "bickering among the subs and RCI, poor coordination by RCI, under-manning by Sweeney, threats to terminate by RCI, delays caused in part by jurisdiction over disputes between subs, recriminations in general, and RCI's inability to establish a sequential work pattern." App. 351. The problems reached a peak in January of 1985 when RCI was ready to terminate for what RCI perceived to be poor performance by Sweeney. Sweeney continued on the job despite the threat of termination. The district court found that "Sweeney's contract with RCI had not been breached by Sweeney" as of January, 1985. App. 351–52.

The district court concluded that RCI knew, by 1985, that it was not going to make an acceptable return on the project. RCI grew vexatious. "During 1985, RCI was beginning to realize that it might take a substantial financial loss on the project, so it began posturing and looking for a scapegoat, its efforts to allocate blame having been limited to fingering Sweeney as its application to the owner for time extensions plus its other claims will attest." App. 352. "RCI's efforts to put the blame on Sweeney completely culminated with its formal termination of Sweeney in August of 1985." *Id.*

This short, troubled history of the relationship between the parties in this case colored the district court's view of the evidence offered by each party to justify its actions. In particular, the district court was not persuaded by RCI's internally-generated documentation of alleged problems with Sweeney's performance. "Prior to the official termination, RCI commenced

doing those things that it considered necessary to firmly saddle Sweeney with fault. This included energizing Mike Gibson to come on the job; his assignment was basically to identify every piece of corrective work needed on the project to get owner acceptance and then establish a back-charging code that would put it in Sweeney's column." *Id.* The district court "attached very little, if any, credibility to evidence generated by RCI in its post-Sweeney termination salvage operation, and this is so because no effort was made to identify fault on the part of RCI and other subs for conditions which were obviously jointly created or done exclusively by parties other than Sweeney." App. 353.

In contrast to the minimal credibility given to RCI's documentation of Sweeney's shortcomings, the district court viewed as substantially reliable the periodic progress reports and requests for payments submitted to the owner by RCI on behalf of Sweeney. These requisitions were approved by the owner's architect and then paid by the owner; together, they indicate that approximately ninety-five percent of Sweeney's work had been cleared for payment. The district court expressed the view that "while obviously a requisition is not a final approval of work, it nevertheless is the best indication that we have by trained people that what is being done is what the owner has expended taxpayer money for." App. 355. Both the owner and RCI held back a portion of the periodic payments in reserve, as allowed by the contract, but RCI's actions with regard to these payments led the district court to believe that RCI was "squirrel[ling] the money" at the same time it was claiming that Sweeney's work was defective. App. 356.

The district court held that RCI terminated Sweeney without justification, therefore breaching the contract between the parties. Although Sweeney's performance, according to the district court, "left a lot to be desired," the reason for Sweeney's shortcomings was found primarily to be the failure of RCI properly to coordinate the work between the various subcontractors. App. 353.

The district court awarded damages to Sweeney without clearly explaining the basis of the award. The court said: "The only figures that I have any confidence in at all are the $193,014.00 and $68,333.00 for a total of $261,347.00. Interest will be at the federal rate and will run on that from September 1, 1985." App. 354. This was not the amount that Sweeney asked for in its complaint. The court felt that Sweeney was not entitled to its full request for damages because "without breaching its contract with RCI, Sweeney, like everyone else on the job, was performing so marginally that the project was doomed." The court went on to enumerate problems with Sweeney's performance. App. 353–54.

## II.

These problems with Sweeney's performance form the basis for the primary issue in this appeal: was RCI's termination of Sweeney justified by defective workmanship, refusal to perform work, or abandonment of the project? The district court concluded that the facts that lay behind these allegations of unacceptable work on the part of Sweeney did not amount to a justification for the termination. We must accept the district court's findings absent a "definite and firm conviction that a mistake has been committed," *e.g., Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 855, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982), unless the district court's findings are based upon "a mistaken impression of applicable legal principles," *id.* at 855 n. 15, 102 S.Ct. at 2189 n. 15, or unless the findings provide an inadequate basis on which to review the judgment below. *See United States ex rel. Belcon, Inc. v. Sherman Construction Co.,* 800 F.2d 1321, 1324 (4th Cir.1986).

The district court's findings in regard to the quality and quantity of Sweeney's performance were bottomed upon the periodic requisitions by RCI to the owner. These requisitions were formulated by RCI after review of the work that Sweeney claimed to have accomplished in Sweeney's own requisitions to RCI. The overall project

requisitions were then reviewed by the project architect. When thus doubly approved, Sweeney's requisitions were paid.[1] According to the last requisition that Sweeney supplied to RCI, dated August 31, 1985, ninety-eight to ninety-nine percent of Sweeney's work was completed at the time it was terminated. RCI contends, however, that these periodic requisitions were merely "estimates" that did not qualify as acceptances of the quality of work in place. RCI further contends that the use of these requisitions by the district court as evidence of Sweeney's adequate performance is an error of law.

## A.

■ Periodic progress payments based on an architect's approval of submitted requisitions are evidence of, but not determinative of, the quality of a contractor's work. The probative value of periodic progress payments in a given construction case depends on the specific language of the parties' contract and the actual process by which payments are approved. The standard form of contract language governing progress payments has changed through the years, as has the function of architects on large construction projects. The legal principles governing the use of progress payments as evidence that work has been completed satisfactorily have not changed greatly, however, at least in Virginia.

The function of monitoring and approving construction work on behalf of the owner was once the sole province of the architect, who completely controlled the certification of work in place while being shielded from liability for negligent certification by

the doctrine of privity of contract. *See, e.g., Ford v. Sturgis*, 14 F.2d 253 (D.C.Cir. 1926); *Winterbottom v. Wright*, 152 Eng. Rep. 402 (Exch. Ch. 1842). The citadel of privity protecting architects began to erode as the concept of privity of contract generally withered, although the shield has remained in place longer for providers of services than for manufacturers of products.[2] Whatever the current status of the privity defense to claims of negligent certification of progress payments, it is clear that the law now recognizes some duty of care on the part of architects or other construction project managers who are responsible for such certification. The certification of progress payments cannot be approached as a "rubberstamp" process without creating exposure to negligence claims. *See, e.g., Peerless Insurance Co. v. Cerny & Associates*, 199 F.Supp. 951 (D.Minn.1961) (holding an architect liable to a surety for the negligent release of retainage funds); Sneed, *The Construction Manager's Liability*, in *Construction Litigation* 317, 379–80 (K. Cushman ed. 1981); *cf. Aetna Insurance Co. v. Hellmuth, Obata & Kassabaum, Inc.*, 392 F.2d 472, 477 n. 3 (8th Cir.1968) (suggesting, in dictum, that an architect who knew of problems with requests for payment by a contractor would have a duty to inquire further and take steps to remedy the problem).

Building construction management has changed significantly in the past several decades. *See generally* Note, *Architectural Malpractice: A Contract-Based Approach*, 92 Harv.L.Rev. 1075, 1083 (1979). Under pre–1976 versions of the American Institute of Architects' (A.I.A.) owner/architect agreement and general conditions

---

**1.** A percentage of each payment was retained by the owner and by RCI. The payments themselves were adjusted down from Sweeney's requisitions, based on RCI's or the owner's estimate of the percentage of work that should actually be paid.

**2.** The United States Court of Appeals for the Eighth Circuit suggested in 1932 that a surety had a right of action against an architect for improper certification of payment. *See Hall v. Union Indemnity Co.*, 61 F.2d 85, 88 (8th Cir.), *cert. denied*, 287 U.S. 663, 53 S.Ct. 222, 77 L.Ed. 572 (1932). The leading assault on the citadel

of privity, however, is *Inman v. Binghamton Housing Authority*, 3 N.Y.2d 137, 164 N.Y.S.2d 669, 143 N.E.2d 895 (1957). Commentators have suggested that the doctrine of privity is not entirely interred. *See* Murphy, *The Impact of the 1976 Edition of AIA Document A201 on the Liability of Architects and Engineers to the Construction Surety for Negligent Certification of Payments*, 45 Ins.Couns.J. 200, 205 (1978); Note, *Liability of Architects and Engineers to Third Parties: A New Approach*, 53 Notre Dame Law. 306, 311 (1977).

of the contract, the project architect acted as the arbiter of any disputes that arose. The architect also, by virtue of the final certificate for payment, represented that all the conditions precedent to full payment on the contract had been fulfilled. *See, e.g.,* American Institute of Architects, Document A201, *The General Conditions of the Contract for the Construction of Buildings* art. 9.4.2 (1970 ed.); *id.* art. 38 (9th ed. 1963). The parties' contracts often provided that all arbitration decisions by the architect were final.

The monitoring and reviewing function once exclusively controlled by architects has increasingly been taken over by professional construction managers, or general contractors. *See* Note, 92 Harv.L.Rev. at 1079–80. In addition, the A.I.A. general conditions, beginning with the 1976 edition, seek to limit the liability of architects and construction managers for faulty progress certifications by providing that the issuance of a progress certificate does not mean that an exhaustive or continuous on-site inspection has been conducted.[3]

The contract at issue in this case does not use the standard A.I.A. language; however, it does reflect an attempt to limit the responsibility of architects and project managers for certification of payments:

> No certificate for payment issued by the Architect or Engineer and no payment, final or otherwise, nor partial or entire use or occupancy of the work by the Owner shall be an acceptance of any work or materials not in accordance with this Contract, nor shall the same relieve the Contractor of responsibility for faulty materials or workmanship or oper-

ate to release the Contractor or his surety from any obligation under the Contract. . . .

Commonwealth of Virginia, *General Conditions of the Contract for Capital Outlay Projects* art. 44(i) (App. 24) (incorporated into the subcontract at issue in this case). This language operates to reserve the owner's right to contest work that has been paid for, but it does not even purport to efface the evidentiary impact that certified payments have in a suit for wrongful termination.

Other portions of the contract make clear that the architect, in this case, was charged with some duty to inspect the ongoing work and approve requests for payment:

> Unless otherwise provided in the specifications, the Owner will make partial payments to the Contractor on the basis of a *duly certified and approved estimate of the work performed during the preceding calendar month as approved by the Architect or Engineer. . . .*

*Id.* art. 44(a) (emphasis added).

> As the Architect or Engineer is, in the first instance, the interpreter of the conditions of the Contract and the judge of its performance, he shall use his powers under the Contract to enforce its faithful performance. He shall *determine the amount, quality, acceptability and fitness of all parts of the work.* He shall interpret the Contract Documents and extra work orders, and he shall decide all other questions in connection with the work. He shall recommend suspension of the work whenever such suspension

---

**3.** In 1976, the A.I.A. changed its general conditions to reflect lessened duties on the part of the architect for certification of construction progress.

> The issuance of a Certificate for Payment will constitute a representation by the Architect to the Owner, based on his observations at the site as provided in Subparagraph 2.2.3 and the data comprising the Application for Payment, that the work has progressed to the point indicated; that, to the best of his knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents . . .; and that the Contractor is entitled to payment in the amount certified.

> However, by issuing a Certificate for Payment, the Architect shall not thereby be deemed to represent that he has made exhaustive or continuous on-site inspections to check the quality or quantity of the Work or that he has reviewed the construction means, methods, techniques, sequences or procedures, or that he has made any examination to ascertain how or for what purpose the Contractor has used the moneys previously paid on account of the Contract Sum.

> American Institute of Architects, *Document A201, The General Conditions of the Contract for the Construction of Buildings* art. 9.4.2 (13th ed. 1976).

may be necessary to ensure the proper execution of the Contract.

*Id.* art. 23(a) (emphasis added).

All material and workmanship, if not otherwise designated by the specifications, shall be *subject to inspection, examination and test by the Architect or Engineer at any and all times* during manufacture and/or construction. The Architect or Engineer shall have authority to reject defective material and workmanship and require its correction, and *this authority shall be diligently exercised to the fullest extent possible.*

*Id.* art. 25(a) (emphasis added). Although this language avoids waiver of the owner's right to contest the quality of a contractor's work before final payment, it lends support to the district court's view that the approved progress payments were good evidence that Sweeney's work was being done in a way satisfactory to the owner.

The exact issue before this court does not appear to have been addressed, at least in Virginia, but the problem that courts have in determining whether a builder has done an acceptable job is older than the streets in Richmond's Shockoe Slip. Indeed, the legal status of progress payments for construction work not far from the locus of this dispute has been considered by courts in the past. In *Scott's Ex'r v. Chesterman,* 117 Va. 584, 85 S.E. 502 (1915), a contractor sued the owner of property at the southwest corner of Sixth and Marshall streets in Richmond. The owner had contracted to have four storehouses built. The contractor constructed the buildings, but the owner refused to pay, claiming that the work was tardy and of unsatisfactory quality. The contracts provided that progress payments would be made periodically and that the final payment would be made on completion of the buildings and procurement of a signed certificate by the project architect. The project architect signed and "O.K.'d" the final bill of the contractor, and the owner paid part of the requested amount, but no other separate architect's certificate was ever issued.

The architect testified that his approval was limited to the fact that the final bill was a correct amount of the money paid and the balance due on the contract. As in the instant case, the owner argued that "[t]he approval of a bill by an architect in no way can be construed as an approval of the work.... [T]he only approval of the work is the last and final certificate given by the architect." *Id.* 85 S.E. at 507. The Virginia Supreme Court concluded, however, that the contractor was entitled to recover on the contract. Under Virginia law after *Scott's Ex'r,* it is a question of fact whether the architect's endorsement of a contractor's bill constitutes approval of the quality of work done under the terms of a construction contract that requires an architect's approval. *Id.* at 509–10.

Another Richmond construction case confirms that the existence of approved progress payments is, absent contract language depriving it of evidentiary force, an important piece of evidence for the factfinder on a claim of shoddy workmanship. In *Richmond College v. Scott-Nuckols Co.,* 124 Va. 333, 98 S.E. 1 (1919), the plaintiff contractor sued Richmond College for payments for work on water and sewer lines that the contractor had built. The contracts called for periodic progress payments to be approved by the owner's engineers and architects. The Virginia Supreme Court expressly acknowledged the importance of periodic inspections of work that would later be covered up, *id.* at 4, and implicitly acknowledged the evidentiary force of periodic approvals. As the court indicated, the owner, the contractor, and the surety must be able to rely, to some extent, on periodic approvals of construction work, since walls and pipes cannot later be routinely deconstructed in order to perform a final inspection. *See* 3A A. Corbin, *Corbin on Contracts* § 650, at 114 (1960); Murphy, 45 Ins.Couns.J. at 201; *cf. Vaughan Construction Co. v. Virginian Railway Co.,* 86 W.Va. 440, 103 S.E. 293, 296 (1920) (contractor bound by owner's acceptance of monthly estimates of construction progress). *But cf. Monto v. Gillooly,* 107 W.Va. 151, 147 S.E. 542, 544 (1929) (failure to include work in periodic

estimates does not, ipso facto, estop a contractor from suing for payment on the work). In sum, although approval by a third party might not, under the terms of a contract, conclusively discharge one party's duty to another, such approval may still serve as "cogent evidence of substantial compliance." *Ace Construction Co. v. W.H. Nichols & Co.*, 353 F.2d 110, 113 (10th Cir.1965).

The parties can effect the desired legal consequences of an architect's or engineer's progress payment approval through the specific language employed in the contract. *See* 3A A. Corbin § 652, at 130–31. It is possible, and it once was common practice, to make an architect's or engineer's determination of the quality of construction binding on all parties to the contract. *See, e.g., Sweeney v. United States*, 109 U.S. 618, 618, 3 S.Ct. 344, 27 L.Ed. 1053 (1883); *Rosenberg v. Turner*, 124 Va. 769, 98 S.E. 763, 765–66 (1919); *cf. United States v. Moorman*, 338 U.S. 457, 461–63, 70 S.Ct. 288, 290–91, 94 L.Ed. 256 (1950) (government contract can provide for final, binding administrative determination of contractual disputes); *Main v. Department of Highways*, 206 Va. 143, 150, 142 S.E.2d 524, 529 (1965) (same).[4] It is also possible to limit severely the prejudicial effect of progress payment approvals on either party, through carefully drawn contract language. *See Wenzel & Henoch Construction Co. v. Metropolitan Water District*, 115 F.2d 25, 29 & n. 4 (9th Cir. 1940).[5]

A party could mitigate the evidentiary force of periodic progress payments by showing that, in fact, they were made without careful inspection and thus did not indicate that acceptable work had been completed. RCI makes such a claim in this case. It fell to the factfinder to weigh RCI's characterization of the progress payments as minimally indicative of quality of work against Sweeney's characterization of them as dispositive.

■ We do not read the district court to have ruled, as RCI suggests it did, that the approved requisitions constituted proof and acceptance of the quality of Sweeney's work.[6] Rather, the district court allowed the admission of the requisitions into evidence, because they are relevant to the issue of the quantity and quality of Sweeney's work. The court then weighed the requisitions against the self-serving documentation created by RCI. The district court chose to credit the evidence that favored Sweeney: the approved requisitions. This evidence indicated that the work had been substantially completed and that it had been of generally acceptable quality. There was no legal error in using the approved requisitions as evidence in this way.

## B.

■ RCI suggests that the district court failed to make adequate findings of fact, as required by Fed.R.Civ.P. 52(a).[7] As this court has recently explained, "[t]o satisfy the demands of Rule 52(a), a trial court

---

4. In Virginia, however, even final, binding decisions of architects or engineers on construction claims cannot be made in derogation of custom or trade usage that is read into a contract. *See Richmond v. Barry*, 109 Va. 274, 63 S.E. 1074, 1078 (1909) (construction contract for penitentiary sewers in Richmond).

5. Parties to a construction contract can also avoid the binding effect of architects' or engineers' certificates by showing that the certificates were issued or refused due to fraud, bad faith, or gross mistake. *See, e.g., John W. Johnson, Inc. v. J.A. Jones Construction Co.*, 369 F.Supp. 484, 495–96 (E.D.Va.1973) (holding that an architect's putatively binding decision was outside the terms of the contract); 3A A. Corbin § 651 (1960). No allegations of bad faith or fraud are presented in this case.

6. The district court explained in its ruling from the bench that "while obviously a requisition is not a final approval of work, it nevertheless is the best indication that we have by trained people that what is being done is what the owner has expended taxpayer money for." App. 355.

7. Fed.R.Civ.P. 52(a) reads:
   In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon.... It will be sufficient if the findings of fact and conclusions of law are stated orally and recorded in open court following the close of the evidence or appear in an opinion or memorandum of decision filed by the court.

must do more than announce statements of ultimate fact. The court must support its rulings by spelling out the subordinate facts on which it relies." *Belcon*, 800 F.2d at 1324 (citing *O'Neal v. Gresham*, 519 F.2d 803 (4th Cir.1975)). In *Belcon*, we remanded to the district court because that court failed to delineate the extent of the plaintiff's duties under the contract, a delineation which was necessary to the ultimate holding in the case.

In this case, too, the district court failed to delineate the scope of Sweeney's duties under the contract. The question is important, because the subcontract provides that termination is proper if the subcontractor "fails, refuses or neglects to carry out the work of the Subcontractor as defined herein." RCI alleges that Sweeney refused to carry out work that it was ordered to do by the project architect. Sweeney responds that this work—including the insertion of backing behind items in fire-rated partitions and the sealing of a gap between a floor slab and a top track—was outside the scope of its contract. However, the general conditions that were made a part of the subcontract appear to require that contested work be carried out by the subcontractor and then charged as extras. Instead of following this procedure, Sweeney apparently refused to do the work. Similarly, RCI alleges that Sweeney abandoned the project before completion.

The district court having made no findings on these matters, we cannot review the propriety of the judgment against RCI. If Sweeney did, without excuse, refuse to do work that the contract required it to do, it appears that termination would have been justified, even if the work that was done was of acceptable quality. On remand, the district court must explain the facts that led it to grant judgment for Sweeney, notwithstanding this alleged refusal to do work and abandonment of the project.

### III.

RCI counterclaimed for the costs that it allegedly incurred in correcting Sweeney's defective workmanship. The district court denied RCI's claim. The court, as noted earlier, did not give much credence to RCI's evidence of defective workmanship. The court did find that RCI's failure to coordinate the project adequately led to at least some of the problems for which RCI sought recovery in its counterclaim. We do not find this view of the evidence to be clearly erroneous. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Accordingly, we affirm the district court's judgment for Sweeney on RCI's counterclaim.

### IV.

█ The parties agree on the measure of damages for wrongful termination of a subcontractor in Virginia. It is the amount of unpaid "work and labor done, money expended and materials furnished," *City of Richmond v. A.H. Ewing's Sons, Inc.*, 201 Va. 862, 114 S.E.2d 608, 613 (1960), as of the date of termination, plus any loss of profits on the work remaining to be done "to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." *ADC Fairways Corp. v. Johnmark Construction, Inc.*, 231 Va. 312, 343 S.E.2d 90, 93 (1986). Sweeney does not deny RCI's contention that damages for unpaid but completed work should be limited to work that was properly done.

The district court awarded damages along with a highly cryptic explanation: "The only figures that I have any confidence in at all are the $193,014.00 and $68,333.00 for a total of $261,347.00." App. 354. Sweeney contends that this amount represents the amount of work performed but not paid. RCI contends that the district court simply awarded the balance due under the contract, regardless of what work was done or how much profit would have been earned. It is impossible for this court to decipher the formula for calculating damages used in this case. However, the amount awarded bears an uncanny resemblance to the difference between the total contract price and the amount that Sweeney had received prior to

termination, according to Sweeney's own requisition form. *See* App. 447. Such an award would be improper, since it would not be adjusted for the cost to Sweeney of performing the balance of the contract.

On remand, if the district court determines that Sweeney was wrongfully terminated, despite the allegations of refusal to do certain work and abandonment of the project, then the court should specify the damages to be awarded to Sweeney in conformance with the measure of damages noted above.

REVERSED AND REMANDED.